## CONSTITUTIONAL PROHIBITORY AMENDMENT.

1. INTOXICATING LIQUORS; *Prohibitory Amendment, a Part of the Constitution.* The constitution provides that propositions for its amendment may be submitted to the people by the concurrence of two-thirds of the members of each house, that such propositions, together with the yeas and nays, shall be entered on the journal, and that if a majority of the electors voting on such proposed amendments adopt them, they shall become a part of the constitution. It also provides for a "general election" to be held annually on the Tuesday succeeding the first Monday in November. From early Kansas history there has been in force a general-election law. It provides all the machinery for elections, names judges, canvassing boards, prescribes forms and procedure for the election of all officers—state, district, county and township. In terms, it names only individuals and officers, and does not refer to constitutional amendments or other questions. In 1879, the legislature, by the requisite vote, submitted a proposition to amend the constitution. This proposition was not entered at length upon the journal, but was described by its title, its scope, and object. Otherwise, the submission was legal and regular. The joint resolution making the submission simply provides that the proposition shall be submitted to the electors at the general election in 1880, and prescribes the form of ballots. It does not in terms declare that the machinery of the general-election law shall control, or that any particular officers or boards shall receive, count or canvass the votes cast. As a matter of fact, the full machinery of the general-election law was appropriated, votes were received, counted, canvassed, and the result declared, just as fully as though it had been in terms ordered. Further, the records of legislative action disclose that while, from 1861 to 1868, propositions for constitutional amendments were submitted, in which the machinery of the general-election law was specifically appropriated, and from 1868 to 1873 no propositions for constitutional amendments were submitted, yet that, from 1873 to the present time, four legislatures have submitted constitutional amendments, and that during these years the same form of submission has been observed as was used in this submission; that many of the propositions so submitted have been adopted, and, without question, recognized and acted upon as parts of the constitution; that among these changes are such vital ones as the numerical organization of the legislature, length of official terms, scope of revenue laws, and biennial sessions. Frequently, also, the full text of the proposed amendment did not appear upon the journal of either house, but, like the one in question, it was referred to only by the title and object. Beyond this, it is a matter of public history, that between the submission and the vote, a period of over twenty months, this proposition for amendment was the subject of a warm and heated canvass throughout the entire state, and no

suggestion, even, was publicly made that the proposition was not fully and legally presented to the people for decision. At the election, seven out of every eight voters recorded, by ballot, their views upon the question, and a majority of these ballots was in favor of the adoption of the amendment. _Held_, That, conceding the irregularity in the proceedings of the legislature, and the doubtful scope of the provisions for the election, yet, in view of the very uncertainty as to those provisions, the past legislative history of similar propositions, the universal prior acquiescence in the same forms of procedure, and the popular and unchallenged acceptance of the legal pendency before the people of the question of this amendment for decision, and also in view of the duty cast upon this court of taking judicial knowledge of everything affecting the existence and validity of any law or portion of the constitution, it must be, and it is adjudged, that such proposed amendment has become, and is, a part of the constitution.

2. CONSTITUTIONAL AMENDMENT, _When Adopted._ When two or more propositions for constitutional amendment are submitted at the same election, either one will be adopted, if a majority of the electors voting upon it votes affirmatively; and this without reference to the number of votes cast on the other propositions, or at that election.

3. PROHIBITORY POWER _of a State._ Nothwithstanding the 14th amendment to the constitution of the United States, any state has the right to prohibit the manufacture and sale of intoxicating liquors for use as a beverage. (_Beer Co. v. Massachusetts_, 97 U. S. 25.)

4. DRAMSHOP ACT, _Not Repealed in toto._ This constitutional amendment does not repeal the dramshop act _in toto_, but only so far as that act authorized licenses for the sale of intoxicating liquors as a beverage.

5. PRACTICE; _Habeas Corpus._ Where a complaint is filed under the dramshop act, which does not in terms charge a sale without a license, but charges generally an unlawful selling, and the defendant, pleading not guilty, goes to trial, is convicted and sentenced, _held_, that the complaint is not such an absolute nullity as will entitle the defendant to a discharge by _habeas corpus._

## Original Proceedings in Habeas Corpus, etc.

THE adoption of the amendment to the state constitution, at the general election of 1880, prohibiting the manufacture and sale of intoxicating liquors, except for certain specified purposes, gave rise to several actions brought to test the validity of the amendment itself, and its effect, if valid, on the dramshop act. Four of these cases were heard and consid-

ered together in this court, in February, 1881. These cases are as follows:

Petition filed in this court, January 5, 1881, for a writ of *habeas corpus.* The petition states in substance that the petitioner, *E. E. Weaver* —

Is unlawfully restrained of his liberty by J. B. Moon, sheriff of Lyon county, Kansas, who now has the petitioner in his custody at the city of Emporia, in said county; that the pretext for such restraint is that this petitioner was, on the first day of January, 1881, before Charles Fletcher, a justice of the peace of the city aforesaid, tried upon the charge that he, "upon the first day of January, 1881, at and within the city of Emporia, a city of the second class, duly incorporated as such under the laws of the state of Kansas, and situated in the county of Lyon, in the state of Kansas, did then and there unlawfully sell to one J. S. Conwell, spirituous, vinous, fermented and intoxicating liquors, to wit, one gallon of whisky, which said sale was made in a building occupied by the said E. E. Weaver, on lot No. 144, Commercial street, in the said city of Emporia; contrary to the form of the statute," etc. That he was by the justice found guilty of the above charge, and sentenced to pay a fine of $1, and the costs of prosecution, taxed at $4.75, and that it was ordered that, in default of his payment thereof, he be committed to the jail of Lyon county, there to remain until he paid the fine and costs aforesaid; that he refused to pay the same, and that thereupon the justice, upon the foregoing judgment, issued and delivered an order of commitment to the sheriff above named, who, by virtue thereof, on the 1st day of January, 1881, took this petitioner into custody; that ever since that day the sheriff has, under such order, restrained the petitioner of his liberty, and proposes so to do until the above judgment is satisfied and the costs of the commitment are paid.

The petitioner says that the complaint upon which he was arrested, tried, and convicted as aforesaid, does not state any public offense, and that the judgment and order of commitment thereon are unauthorized by law.

The petition closes with the common prayer for the issuance of the writ, and that the petitioner may be discharged from custody, etc.

*J. I. Mayse* also filed his petition in this court, January 5,

1881, for a writ of *habeas corpus*. The facts stated in this petition are very like those set forth in Weaver's petition, and do not differ materially therefrom, except that the complaint, upon which this petitioner was convicted, is in substance, that—

"On the first day of January, 1881, in the county of Lyon, and state of Kansas, one J. I. Mayse did then and there unlawfully sell spirituous, vinous, fermented and intoxicating liquor, to wit, one glass of whisky, containing about one-half of a gill of whisky, to one John Smith, without then and there having any license therefor; which said sale was made in a certain building on lot No. 142, on Commercial street, in the city of Emporia, in said county and state, and which sale was then and there made with the unlawful intent that the same should be drunk on said premises as a beverage, and that neither the sale nor purchase of said liquor was for medical, scientific or mechanical purposes; contrary to the form of the statute," etc.

*Mayse* prayed for the issuance of a writ in his behalf, and that he might be discharged from custody, etc.

At the December Term, 1880, of the district court of Cowley county, E. S. Torrance, the county attorney of that county, filed an amended information in effect, that—

"Reinhardt Ehret, at and within the county of Cowley, in the state of Kansas, in a certain one-story frame building situate on lot No. 5, in block No. 129, in the city of Winfield, in said county, on the 26th day of November, 1880, did unlawfully sell to one David Thomas, then and there being, spirituous and intoxicating liquor, commonly called whisky, which said sale was not made for medical, scientific or mechanical purposes."

The defendant, *Ehret*, moved the court to quash the information, for the reason that it does not state facts sufficient to constitute a public offense. The court sustained the motion, quashed the information, and adjudged that the defendant go hence without day. *The State* excepted, and has brought the case here for review.

At the January Term, 1881, of the district court of Shaw-

nee county, A. H. Vance, the county attorney of that county, filed an information in effect that—

"Charles Grieve and William Grieve, on the 30th day of December, 1880, at their grocery, *alias* dramshop, . . . in the basement of a certain three-story brick building, situate on lot No. 181, Kansas avenue, in the city of Topeka, Shawnee county, Kansas, commonly called the 'San Juan saloon,' then and there situated, one gill of intoxicating liquor, to wit, one gill of whisky to one Silas Rain, then and there being, did unlawfully sell, the same not being sold for medical, scientific or mechanical purposes, contrary to the statute," etc.

At the above term, the defendants moved the court to quash the information, for the reason that it does not state facts sufficient to constitute a public offense, which motion the court overruled, the defendants excepting thereto. Thereupon they pleaded not guilty, and a trial was had by a jury. To maintain the issue on their part, they offered in evidence ordinance No. 279 of the city of Topeka, authorizing the licensing of dramshops, and with such offer they proposed to make due proof of the legal publication thereof. They also offered in evidence a license in due form, unexpired and unrevoked, which had been granted them by the city aforesaid, to keep a dramshop at the premises aforesaid, and thereat to sell spirituous, vinous, fermented and intoxicating liquors; and also their bond executed to the city, in compliance with the ordinance aforesaid; but *The State* objected to the introduction of each and every part of the foregoing evidence, for the reason that the same is incompetent, irrelevant, and immaterial. The court sustained this objection, the defendants excepting thereto.

The court, in instructing the jury, after stating the substance of the information, said, as follows:

"The defendants admit the sale, but claim that they had the right to make it by virtue of their taking out and having a license as dramshop keepers, from the city of Topeka. The plaintiff admits that the city of Topeka is a city of the second class, and that the defendants had taken out and had a license which was in all respects in conformity with the laws of the

state of Kansas and the ordinance of said city relating to the licensing of dramshops, and that such license was unrevoked and had not expired at the time of making the sale complained of. The only question, then, in this case is, whether the amendment of the constitution, commonly called the 'prohibition amendment,' which was submitted to the electors of the state, and by them voted upon November 2, 1880, is in force. The court instructs you that said amendment became and was a part of the constitution of this state, previous to the date of the alleged sale, and that the provisions of the dramshop act, so far as they relate to or authorize the licensing of the sale of intoxicating liquors for other than medicinal, scientific, or mechanical purposes, were and are repealed or abrogated by said constitutional amendment; and any sale of such liquors, for purposes other than medicinal, mechanical and scientific, are unauthorized and contrary to law. The penal provisions of the dramshop act, not being inconsistent with the provisions of said amendment, are in full force and effect. If you find, therefore, that the defendants made such sale for purposes other than those mentioned, notwithstanding the fact that they had taken out and had a license as dramshop keepers, and had in all things complied with the law in obtaining such license, and that the same was unrevoked and had not expired, you will find the defendants guilty as charged in the information."

The jury returned a verdict for *The State*. A new trial was denied, and each of the defendants was adjudged to pay a fine of $10, and the costs, taxed at $19.10, and to be committed to the jail of Shawnee county until such fine and costs were paid. The defendants bring the case here.

Mr. *C. N. Sterry* filed a brief for the petitioners, Weaver and Mayse, and also made an oral argument in their behalf. Mr. *T. N. Sedgwick*, county attorney of Lyon county, and Messrs. *J. J. Buck*, *L. B. Kellogg*, and *J. F. Culver* filed briefs for The State; Messrs. *Buck* and *Kellogg* also argued orally in its behalf.

In The State v. Ehret, Messrs. *Soward & Asp* filed a brief for The State, appellant; and Messrs. *Hackney & McDonald*, a brief for the appellee.

In The State v. Grieve, *et al.*, Messrs. *W. C. Webb* and *John*

45—24 KAS.

*Martin* made oral arguments for the appellants; and Messrs. *Martin & Mileham* filed a brief in their behalf. Messrs. *Davis & Jetmore* argued orally and filed a brief, *contra*.

The opinion herein was filed February 22, 1881.

The opinion of the court was delivered by

BREWER, J.: The paramount question in these cases is, the validity of the prohibitory amendment submitted at the last November election. Counsel have invoked our most careful and serious consideration in its determination. Its importance compels that. On the one hand, we have been told that it is the crowning effort of a brave and earnest people to free itself from the curse of intoxication; on the other, that it is a departure from the wisdom and experience of the past, a radical change of policy, trespassing upon personal liberty and rights of property. But questions of policy are not questions for the courts. They are wrought out and fought out in the legislature and before the people. Here the single question is one of power. We make no laws; we change no constitutions; we inaugurate no policy. When the legislature enacts a law, the only question which we can decide is, whether the limitations of the constitution have been infringed upon. When a constitutional amendment has been submitted, the single inquiry for us is, whether it has received the sanction of popular approval in the manner prescribed by the fundamental law. So, that whatever may be the individual opinions of the justices of this court as to the wisdom or folly of any law or constitutional amendment, and notwithstanding the right which as individual citizens we may exercise with all other citizens in expressing through the ballot box our personal approval or disapproval of proposed constitutional changes, as a court, our single inquiry is, have constitutional requirements been observed, and limits of power been regarded? We have no veto. The judge who casts his individual opinions of wisdom or policy into the decision of questions of constitutional limitations and powers, simply usurps a prerogative never committed to him in the

wise distribution of duties made by the people in their fundamental law.

With these preliminary observations, we pass to the question whether this prohibitory amendment has received the popular approval in such a manner as to become a part of the constitution. The state board of canvassers, after a canvass of the votes, declared, in November last, that it had received a majority of the votes cast upon the question, and had therefore become a part of the organic law. This declaration is challenged upon two grounds: first, a non-compliance with constitutional methods; and second, a conflict with the superior obligations of the constitution of the United States, and the indestructible rights of personal liberty and individual property. Have constitutional forms and methods been followed? The provision concerning amendments is found in § 1, art. 14, and is as follows:

"Propositions for the amendment of this constitution may be made by either branch of the legislature; and if two-thirds of all the members elected to each house shall concur therein, such proposed amendments, together with the yeas and nays, shall be entered on the journal; and the secretary of state shall cause the same to be published in at least one newspaper in each county of the state where a newspaper is published, for three months preceding the next election for representatives, at which time the same shall be submitted to the electors for their approval or rejection; and if a majority of the electors voting on said amendments, at said election, shall adopt the amendments, the same shall become a part of the constitution. When more than one amendment shall be submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately; and not more than three propositions to amend shall be submitted at the same election."

The joint resolution, as it appears in the statutes of 1879, reads as follows:

"SECTION 1. The following proposition to amend the constitution of the state of Kansas shall be submitted to the electors of the state, for adoption or rejection, at the general

election to be held on Tuesday succeeding the first Monday of November, A. D. eighteen hundred and eighty:

"'Proposition.—Article fifteen shall be amended by adding section ten thereto, which shall read as follows: The manufacture and sale of intoxicating liquors shall be forever prohibited in this state, except for medical, scientific and mechanical purposes.'

"SEC. 2. The following shall be the method of submitting said proposition to the electors: The ballots shall be either written or printed, or partly written and partly printed, and those voting for the proposition shall vote, 'For the proposition to amend the constitution,' and those voting against the proposition shall vote, 'Against the proposition to amend the constitution.'

"SEC. 3. This resolution shall take effect and be in force from and after its publication in the statute book." (Laws 1879, p. 293.)

The original document, with the indorsements of the various officers of the two houses, and the signature of the governor, is in the office of the secretary of state, and is as published.

The legislative history of this amendment, known as senate joint resolution No. 3, is, briefly, as follows:

1879, Feb. 8.—Introduced by Senator Hamlin, by unanimous consent, and read the first time. (Senate Journal, p. 312.)

Feb. 13.—Reported back from committee on judiciary, with recommendation that it be referred to committee of the whole, and printed. (Senate Journal, 357.)

Feb. 20.—Reported back from committee of the whole, with recommendation that it be passed. (Senate Journal, 416.)

Feb. 21.—Passed the senate; yeas 37, nays 0. (Senate Journal, 432.)

Feb. 21.—House informed of the passage of the resolution by the senate. (House Journal, 576.)

Feb. 24.—First and second reading, and referred to committee on temperance. (House Journal, 618 and 620.)

Feb. 26.—Reported back to the house, with recommendation that it be passed. (House Journal, 743.)

March 4.—Ordered to third reading. (House Journal, 949.)

March 5.—Read the third time, and passed; yeas 88, nays 32; absent or not voting, 10; two-thirds of all the members elected to the house, 86. (House Journal, 999.)

March 6.—Passage of the resolution by the house reported to the senate. (Senate Journal, 611.)

March 8.—Approved by the governor. (Senate Journal, 715.)

Upon the journal of neither house does this amendment appear; it is simply described as "senate joint resolution No. 3, proposing an amendment to art. XV of the constitution of the state of Kansas, relating to the manufacture and sale of intoxicating liquors, by adding section 10 to said article." This article XV is entitled "Miscellaneous," and nothing in it, prior to this proposed section 10, refers to the manufacture or sale of intoxicating liquors.

Upon the canvass made by the state board of canvassers, it declared that this amendment received 92,302 votes, that only 84,304 were cast against it, and that, having received a majority of all the votes cast upon the question, it was adopted by the people, and had become a part of the constitution.

Upon these facts all the questions as to form and method arise. It is insisted, first, that the proposed amendment was never legally submitted to the people, inasmuch as it does not appear in full upon the journal; second, that no provision was made for receiving, counting, or canvassing votes; that, therefore, the action of the election boards, county commissioners and state canvassers, was without warrant of law and void, and that this court has and can have no legal evidence that a majority of the votes cast upon this amendment was in favor of it; and finally, that two amendments having been submitted, an examination of the votes by precincts shows that a majority of all the votes on the two amendments was not cast in favor of this.

The constitution provides that the "proposed amendments, together with the yeas and nays, shall be entered on the journal." (Art. 14, § 1.) Is the failure to enter this amendment at length on the journals, fatal? It is well said by counsel, that no change can be made in the fundamental law, except in the manner prescribed by that law. In the case of *Collier v. Frierson*, 24 Ala. 100, the court says: "We enter-

tain no doubt, that to change the constitution in any other mode than by a convention, every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment." That case illustrates and enforces this proposition. The constitution of Alabama required, in order to work án amendment, that the proposition be approved by two-thirds of one legislature—a popular vote—and then by two-thirds of the next legislature. This last approval was wanting, and the court held that the constitution had not been amended. In other words, proceedings under a constitution to change that constitution must be in accord with the manner prescribed by that constitution. But this only brings us to the real question in this case: Is a proposition to amend the constitution in the nature of a criminal proceeding, in which the opponents of change stand as defendants in a criminal action, entitled to avail themselves of any technical error, or mere verbal mistake; or, is it rather a civil proceeding, in which those omissions and errors which work no wrong to substantial rights are to be disregarded? Unhesitatingly, we affirm the latter. The central idea of Kansas law, as of Kansas history, is, that substance of right is grander and more potent than methods and forms. The two important, vital elements in any constitutional amendment, are, the assent of two-thirds of the legislature, and a majority of the popular vote. Beyond these, other provisions are mere machinery and forms. They may not be disregarded, because, by them, certainty as to the essentials is secured. But they are not themselves the essentials. Take a strong illustration: The constitution requires that the "secretary of state shall cause the same to be published in at least one newspaper in each county of the state where a newspaper is published, for three months preceding," etc. Suppose a unanimous vote of both houses of the legislature, and a unanimous vote of the people in favor of a constitutional amendment, but that the secretary had omitted to publish in one county in which a newspaper was published, would it not be simply an insult to common sense

to hold that thereby the will of the legislature and people had been defeated? Is it within the power of the secretary, either through ignorance or design, to thwart the popular decision? Is he given a veto, or can he create one? This may be an extreme case, but it only illustrates the principle. The records of the proceedings of the two houses are made, not by the houses themselves, but by clerical officers. True, they are under the control of the respective houses, but in fact the records are made by clerks. May they defeat the legislative will? The constitution does not make amendments dependent upon their approval or their action. To insure certainty and guard against mistake, journal evidence of the amendment and votes is prescribed, but this is mere matter of evidence, and not the substantial condition of constitutional change. In *Leavenworth County v. Higginbotham,* 17 Kas. 62, a law was upheld, although the signature of the presiding officer of the senate was never affixed to it as the constitution prescribes, and although the yeas and nays were not entered on the journal of the senate on its concurrence in certain slight amendments made by the house. See also *Division of Howard County,* 15 Kas. 194.

Again, in constitutional changes the popular voice is the *paramount* act. While to guard against undue haste and temporary excitement, to prevent unnecessary and frequent appeals for constitutional amendments, the assent of two-thirds of the legislature is prescribed as a condition precedent, yet after all, that which determines constitutional changes is the popular will. This is a government by the people, and whenever the clear voice of the people is heard, legislatures and courts must obey. True, a popular vote without previous legislative sanction must be disregarded. There is no certainty that all who could would take part in such a vote, or that they who did, all realize that it was a final action. It lacks the sanction of law, is a disregard of constitutional methods and limitations, and should be taken as a request for a change, rather than as a change itself. But notwithstanding this, legislative action is simply a determina-

tion to submit the question to popular decision. It is in no sense final. No number of legislatures and no amount of legislative action can change the fundamental law. This was made by the people, who alone can change it. The action of the legislature in respect to constitutional changes is something like the action of a committee of the legislature in respect to the legislative disposition of a bill. It presents, it recommends, but it does not decide. And who ever thought of declaring a law invalid by reason of any irregularities in the proceedings of the committee which first passed upon it? It is the legislative action which is considered in determining whether the law has been constitutionally passed; and it is the popular action which is principally to be considered in determining whether a constitutional amendment has been adopted.

We pass now to the second, and really the most important, question. It will be noticed that the joint resolution simply provides that the proposed amendment shall be submitted to the electors at the general election. It does not otherwise provide for casting, receiving, counting or canvassing votes. It appoints no officers for the purposes of this election. It casts no duty upon the general election officers, imposes no penalty for false return, forgery, or other crime, and does not in terms refer to the general election laws. By what authority did the various election boards receive any votes tendered upon this question, or count any such votes, or return the result to the county officials? By what authority did these officers canvass and return to the state board of canvassers, or the latter canvass those returns and proclaim the result?

Suppose that the election judges in any precinct had falsely and knowingly certified to the county canvassers that a thousand votes were cast in favor of the amendment, when in fact there were none; or that the county clerk had made a similarly false certificate to the state canvassers; or that the latter had falsely declared the result of the canvass made by them; or that either officer or board had omitted to return or certify the true vote against the amendment: what law

would have been violated, and to what punishment would the wrong-doer be subjected? A lie as such, whether oral or in writing, is not a criminal offense. The law punishes only when some statute is broken; and if no statute casts any duty on these various officers, the moral quality of their conduct is not a subject of inquiry in the criminal courts. In order to make a valid election, is it not essential, not merely that a question be submitted, and a time for the election fixed, but also that election machinery be provided? (*Lewis v. Bourbon County,* 12 Kas. 211 ; *A. T. & S. F. Rld. Co. v. Jefferson County,* 17 Kas. 39.) Does the fact that any officers assumed to conduct the election and canvass, bind any one or determine the result, unless such officers were by law authorized to so conduct and canvass? In short, is not the failure to name the officers and provide the machinery for the election such an omission as renders invalid any election in fact held, or any canvass and declaration of result in fact made.

It must be conceded that this proposition has great force. The arguments sustaining it were put with unequaled skill and ability by the learned counsel, and the claim that to sustain this election the court must assume the functions of a legislature, and supply the omissions of that body, is very plausible. In dissenting from this claim, several reasons control; perhaps no one by itself is sufficient, but all together compel us to uphold the election as actually held, and the result as actually declared.

And first, the election itself was authorized by law. It was not a mere volunteer proceeding. The proposition was put by legislative sanction before the people, who were invited to consider and act upon it. "The following proposition . . . shall be submitted to the electors of the state for adoption or rejection." Both constitution and statute name the time and the persons at which and to whom this proposition is submitted. And the statute further provides that the proposition shall be submitted "at the general election." This implies something more than the mere matter of time. The consti-

tution says "at which time." But the statute goes further: it does not read, at the time, or on the day of the general election, but at that election itself. For the purpose of voting upon and determining the question submitted, it thus refers to and appropriates the statutory machinery of the general election. Concede that this may technically be limited to the mere proceedings of election day, and that the constitution and the statute together, prescribing the form of ballots, the parties entitled to vote, the time of election, and the election machinery, have exhausted their force at the close of the polls, and what then? Must not the court take judicial notice of the result? We are bound to know what the constitution is — what the statutes are. We take judicial notice of them. No proof is required — none is proper. In the case of the *Division of Howard County,* 15 Kas. 213, it is said: "Of course, we take judicial notice, without proof, of all the laws of our own state. All the courts of the state are required to do this. And in doing this, we take judicial notice of what our books of published law contain, of what the enrolled bills contain, of what the journals of the legislature contain, and, indeed, of everything that is allowed to affect the validity of any law, or that is allowed to affect or modify its meaning in any respect whatever." Now, the constitution provides that, "if a majority of the electors voting on said amendments at said election shall adopt the amendments; the same shall become a part of the constitution." Suppose a majority did adopt, but no machinery is provided for ascertaining that fact, no one is authorized to canvass and proclaim the result, and no one in fact does so canvass and proclaim: must not the court nevertheless take judicial notice of the result? When the constitution says that upon certain conditions an amendment is adopted, must we not take judicial notice of the happening of those conditions? It is the election, and not the canvass, that works the change; and if we are bound to take notice "of everything that is allowed to affect the validity of any law," must we not of everything affecting the fundamental as well as

the statute law? And judicial notice does not depend on the actual knowledge of the judge or the extent of the personal labor and inquiry required. The justice of the peace in the most remote county in the northwest portion of the state, who may never have seen a copy of the journal of either house, takes judicial notice of all things appearing in either journal, so far as they affect the validity of any law. When challenge is made, he must investigate and know. So, although it may seem extravagant, yet if the legislature has failed to make provision for the canvass of any vote on a proposed constitutional amendment, and if in fact none be made, must not the courts take judicial notice of the actual vote and its result? It may be said if we take judicial notice of votes on one question, why not on all, and what need of election contests? Let the court determine on its judicial knowledge. But we do not take judicial notice of votes and elections as such, but we can take notice of them so far, and only so far, as they affect the validity of some public law. We do not take judicial notice of all things in the journals of the houses, or of all in the statute books. A private act must be proved, and only such portion of the journals as affects the validity of some public law is matter of judicial notice. The point is this: The courts are to know what is and what is not a public law of the state; what is and what is not a part of the constitution; and to that end, must take judicial notice of everything, near or remote, that determines such fact. This argument condensed, is this: The courts take judicial notice of what is public law, statutory or constitutional. When a majority of the electors voting on an amendment at an election properly ordered, adopts it, then it becomes a part of the constitution. So the constitution itself says. The courts must judicially know whether such amendment has been adopted, and is in fact a part of the constitution, and to that end, if need be, must take judicial notice of every ballot cast at that election.

But, second: does not a fair reading, a reasonable construction of the resolution, make it broad enough to appro-

priate the entire election machinery, including all relating to canvass as well as to casting votes? It says that the proposition "shall be submitted to the electors of the state for adoption or rejection, at the general election to be held on the Tuesday succeeding," etc.; and the second section prescribes the form of the ballot. This, as we have just considered, plainly authorizes the vote. Does it not also appropriate the whole election machinery? We have a general election law. It is a single statute, yet it covers all details of ordinary elections, names election boards, prescribes rules of election, provides for returns and canvass of all votes — township, county, district, and state. True, it speaks of individuals as though persons were all affected by and the subject of elections, yet it is one election law of the state. It is a general election law. Now, when a proposition is submitted to the people at the general election, without further words or designation, does it not mean that the proposition is to be decided in the manner prescribed by that general election law? It is an old and familiar doctrine that that which is within the spirit of the statute, though not within the letter, is a part of it; as well as that which is not within the spirit but within the letter, is not a part of it. *Quæcunque intra rationem legis inveniuntur, intra legem ipsam esse judicantur.* (2 Coke's Inst. 689.) It will not be presumed that the legislature went through the form of legislative action, intending nothing, (*City of Emporia v. Norton,* 16 Kas. 236,) or that it made incomplete provision for carrying its intention into effect. Rather, in order to support and make effective legislation, it will be presumed that it used words and phrases in a larger and broader sense than common. Now, along this line of argument, one of two things is clear: either the legislature intended by the words used, to appropriate the entire machinery of the general election law, or else it ignorantly or intentionally omitted that which is necessary to make its action effective. By the ordinary rules of construction, the former must be presumed, rather than the latter. Legislation should be supported if possible. If in common conversation it should be stated that

a question had been submitted to the electors at a specific and named election, the universal understanding would be, not only that the votes were to be received, but also that they were to be counted, canvassed, and the result proclaimed; and all this would be implied from the simple statement in reference to the submission. Should not equal extent be given to the language used by the legislature, if, without such extent, its intended action fails? Of course, what the legislature omits, the courts cannot supply. But the largest latitude may, and should be given to the language used, in order to uphold, rather than defeat its action. Especially is this true when, otherwise, large interests fully considered, will fail, and more especially is this true, when upon the faith of such legislative action the people of the whole state have been stirred up and moved to express their judgment upon a matter understood to be before them for decision.

Again, concede that criminal laws cannot be extended by implication, and that there is an entire lack of penalties for misconduct at the election, either on the part of electors or election officers, yet such omission is not fatal to the validity of the election. If every portion of the penal laws touching misconduct at elections were stricken out, the substantial elements of the general-election statute would remain. Elections held under it would be as valid and effective as now. No official duty is made more sacred and binding because the legislative wisdom has prescribed penalties for any breach of such duty. Though every statute punishing official misconduct were repealed, official duty would remain obligatory, and official action legal and effective.

But, beyond presumptions and necessities, we have experience. That which for years has been accepted and acted upon, may now justly be considered as sufficient. A mere form of action once recognized and approved, may properly be followed without danger to the substance. Now the present method of submission of amendments to the constitution has been in use for many years. Several amendments thus submitted have been adopted, and recognized, and acted upon as

parts of the constitution. Let us look along the line of the past. From the admission of the state in 1861, to 1868, certain amendments were submitted, and the propositions therefor in terms appropriated the general-election law. From 1868 to 1873 no propositions for amendment were submitted. Since then, this is history: In 1873 an amendment was proposed, changing the numerical organization of the legislature. (Laws of 1873, p. 249.) This was approved by the popular vote, and it has since been acted upon in the legislative organization. Its validity has never been challenged. All laws since then have been enacted by legislatures organized upon the basis established by that amendment. All taxes levied, all appropriations made, all the motions of governmental machinery, center and rest upon the validity of such legislatures. In 1875, three amendments were submitted. (Laws 1875, p. 207.) These also were accepted, and they have since been acted upon without challenge. In 1876, two amendments were proposed, (Laws 1876, p. 299,) adopted, and popularly accepted, without question. In 1879, three questions were submitted to popular vote, one for a constitutional convention, one changing the section concerning assessment and taxation, and the other, the one in present controversy. Now, in all these legislative acts since and including 1873, the provisions concerning popular action are similar. There is no specific appropriation of the machinery of the general-election law, and no provision beyond a submission to the electors at the general election, and a prescription of the form of the ballots; yet to-day the sufficiency of this form of submission is for the first time challenged. If we were to hold that form insufficient, what becomes of these various amendments? Will it not unsettle all that for nearly a decade has been accepted and acted upon as sufficient? Unsettling them, will not all legislation, all conduct and all rights based thereon fail, and the general order and peace stand in confusion? Counsel say no, because there has been a general acquiescence in the results of such elections—both legislative, executive and judicial recognition of

the validity of those amendments. Hence, everything of irregularity and informality has been waived. But the question necessarily arises: If such acquiescence and recognition are sufficient to support these amendments, do they not support the form of submission as well as the result of the election? Do they not carry an affirmation on the part of the legislatures which so submitted, of the people who acted upon such submission, and of all the departments of the government which have recognized the validity of these amendments, that this form of submission is sufficient under the constitution? Is it not a legislative and popular interpretation of the scope and import of the language used in these various acts of submission? The several election officers and canvassing boards proceeded to act as though they were specially deputed, and from year to year there has been universal acquiescence. It must be borne in mind that it is not simply a single submission and election thus acquiesced in. After one election, and the adoption of one amendment proclaimed, a succeeding legislature submits further propositions. It finds that a certain form of submission had been used, that under it the people had voted, and all proper canvass and returns made, and no question raised as to the validity of all these proceedings. And in using the same form of language in submitting these propositions, does it not substantially say that it intends all that the people have impliedly recognized as contained in the former submission? And this is repeated again and again. Surely, in all this there is an interpretation of the language which may not be ignored. Words and phrases by usage and acquiescence ofttimes acquire a meaning beyond their natural import. A man may bind himself by habitual use of any signature. It is a frequent thing to strain the ordinary meaning of a term or a sentence in a contract to effectuate the manifest intent of the contracting parties. It is a cardinal canon of construction of all statutes, that the intent governs. (*The State v. Bancroft*, 12 Kas. 170.) And repeated use by succeeding legislatures of any word or phrase in any restricted or enlarged sense compels a judicial

recognition of that sense. (*County Seat of Linn County*, 15 Kas. 527.) Here also may appropriately be noticed the fact that the past tells the same story of omission from the legislative journals, of the full text of the proposed amendment, as it does by defect in the form of submission. Many amendments have gone before the people, been adopted and acted upon as parts of the constitution, when only the title, scope and object can be found on the journals. (House Journal, 1876, p. 527; Senate Journal, 1876, p. 303; House Journal, 1875, pp. 444, 445; Senate Journal, 1870, pp. 542, 543; House Journal, 1873, p. 763; Senate Journal, 1873, p. 584.)

Another thought, and we pass from this question. We may not ignore public history. Nearly two years elapsed between the time the proposition passed the legislature and the day of the popular vote. During this time this question was not forgotten. It was discussed in every household and at every meeting. The state was thoroughly canvassed; its merits and demerits were presented and supported by all possible arguments. Pulpit, press and platform were full of it. It was assumed on all sides that the question was before the people for decision. There was not even a suggestion of any such defect in the form of submission as would defeat the popular decision. If this objection had been raised prior to the election, the legislature could have been easily convened, and the defect remedied. But there was not a suggestion from friend or foe. The contest was warm and active. After the contest was ended and the election over, the claim is for the first time made that after all there was nothing in fact before the people; that this whole canvass, excitement and struggle was simply a stupendous farce, meaning nothing, accomplishing nothing. This is a government of the people, by the people, and for the people. This court has again and again recognized the doctrine lying at the foundation of popular governments, that in elections the will of the majority controls, and that mere irregularities or informalities in the conduct of an election are impotent to thwart the expressed will of such majority. (*Gilleland v. Schuyler*, 9 Kas. 569; *Morris v. Van-*

*laningham,* 11 Kas. 269; *Wildman v. Anderson,* 17 Kas. 344; *Jones v. Caldwell,* 21 Kas. 186; *Lewis v. Comm'rs of Bourbon Co.,* 12 Kas. 186.)

In the opinion of the case last cited, we said, speaking of a case somewhat similar: "Notwithstanding the silence of the statute and the omissions of the order, an election would doubtless be valid where the people generally acquiesced in the manner, and took part in the election." We could not have used language more apt if we had then been anticipating this very case. While estoppel may not technically bind either party to an election, yet where a mere defect of form exists which may, if presented seasonably, be fully corrected, and is not suggested until after the election is over, there is eminent justice in applying the principles of estoppel, and holding that they who have gone to trial on the merits shall not, when beat in there, go back to an amendable defect in the preliminary proceedings.

Another argument is based upon the use of the plural in this cause: "And if a majority of the electors voting on said *amendments* at said election shall adopt the *amendments,* the same shall become a part of the constitution." Now it is said, that computing the vote by precincts, it is apparent that more than twice 92,302 voters voted on the two amendments, some on one and some on the other, and that before any one amendment is adopted, it must appear that a majority of all who voted on all the amendments, voted in the affirmative on the one. This does not commend itself to our judgment. A more correct interpretation grammatically of this language would be, that no single amendment could be adopted unless all were, there being no provision for adopting one out of several. But we think the clear intent is, that every amendment submitted shall stand upon its own merits, and that if a majority of those voting upon it is in the affirmative, it becomes a part of the constitution. This idea is confirmed by the further provision, that where more than one amendment is submitted, they must be so submitted as to enable the voters to vote on each separately. A distinction is also

46 — 24 KAS.

apparent between the number requisite for the adoption of an amendment, and that for calling a constitutional convention. In the latter, it must be a majority of all the electors voting at that election; while in the former, it is a majority of those voting on the amendment.

A final argument against the validity of this amendment is, that it is in conflict with the fourteenth amendment of the federal constitution. Counsel have made an ingenious argument, based on the assumption that this amendment was taken substantially from the bill of rights of the constitution of the state of New York, and that the scope and effect of such amendment had been determined by the court of appeals in New York, in the cases of *Wynehamer v. The People*, 13 N. Y. 378, and *Metropolitan Board of Excise v. Barrie*, 34 N. Y. 657. A full answer to this argument is the unanimous decision of the supreme court of United States, the final arbiter in all questions of alleged infractions of the federal constitution, in the case of the *Beer Co. v. Massachusetts*, 7 Otto, (97 U. S.) 25, a decision since the adoption of the fourteenth amendment, and reaffirming the decision in *Bartemeyer v. Iowa*, 18 Wall. 129, in which the court decides that a state law prohibiting the manufacture and sale of intoxicating liquors for use as a beverage is not repugnant to any clause of the United States constitution. Comment upon or argument to support that decision would be a manifestly superfluous and unnecessary work.

We pass now to the second important question: If the constitutional amendment was adopted, what effect has it upon the dramshop act? And upon this question the members of this court are not fully in accord, yet the majority holds that the penalties of that act are still in force. The difference arises upon the scope and applicability of two accepted and well-approved rules of statutory construction. One is, that repeals by implication are not favored; that where a subsequent statute departs in some respects from a prior, without any formal repeal of such prior act, the provisions of the former will be upheld so far as not absolutely

inconsistent with those of the latter.   This is true of constitutional as well as statutory changes.   (*Brooks v. Borough of Danville*, [Pa. Sup. Ct.] 23 Albany L. J. 95; *Prouty v. Stover*, 11 Kas. 235.)   Along this line the thought is, that the dramshop act prohibits, under penalty, the sale of liquor to certain persons, upon certain days, and except upon certain conditions, as to petition, license, etc.   The amendment has simply enlarged and increased these restrictions.   It permits the sale for certain purposes.   It thus, without abrogating penalties, simply puts additional limitations upon the sale.   Before the amendment and under the dramshop act, the licensed dealer might sell to adults not habitual drunkards, upon secular days not devoted to special purposes.   Under the amendment, such licensed dealer may still sell, but only for certain purposes.   The right to sell remains.   The conditions of license continue.   The only change is, in the limitations upon the purposes for which the sale may be made.   My associates think this the sounder argument, and the true construction.

The other theory is, that when the latter law is evidently a substitute for the former, when the underlying idea and thought of the one is a departure from that of the other, then, although no formal words of repeal are used, the former wholly ceases upon the adoption of the latter, and this, although certain sections and provisions of the former may be consistent with and valid as parts of the latter.   This seems to the writer of this opinion, the correct view.   Whatever of similarity may exist in details and means of enforcement, I think the idea underlying license is widely and essentially different from that supporting prohibition.   True, license has limitations, restraints and penalties, and prohibition has also its limitations and penalties.   The penalties to uphold the one may be of the very nature of those to enforce the other.   But the idea of license is to permit the use, while guarding against the abuse, of liquors as a beverage; but the idea of prohibition is, the absolute destruction of the use, as a beverage, of any intoxicating liquors.   I do not care to push this argument to any extent, for the present legislature

has already adopted an act intended to give active force and operation to the provisions of the amendment.

In the case of Ehret, it is contended, that as the defendant had obtained a license from the city of Winfield, prior to the adoption of the amendment, to sell intoxicants, and as such license had not at the time of the alleged offense expired by its terms, he was exempt from the operation of the provisions of such amendment, on the ground that the license is a contract that could not be ignored or abrogated by constitutional or statute law. Not so. Such licenses are not contracts within the meaning of the federal constitution, and are liable to be modified or set aside whenever they fail to promote the good order and welfare of the community. (*Calder v. Kurby*, 5 Gray, 597; *Freleigh v. The State*, 8 Mo. 606; *Commonwealth v. Brennan*, 103 Mass. 70; Cooley's Const. Lim. 582, 583.) Within the views of the majority of the court, under the existing laws, licenses can only be issued to sell intoxicating liquors for medical, scientific and mechanical purposes. All sales of intoxicating liquors, since the adoption of the amendment, whether under licenses issued before or since its adoption, for other purposes, are unlawful.

A final question is presented in one of these cases—that of Weaver. It is insisted that the complaint is fatally defective. It charges that "the defendant did, on January 1, 1881, in Emporia city, Lyon county, Kansas, *unlawfully* sell to one J. S. Conwell, spirituous, vinous, fermented and intoxicating liquors, to wit, one gallon of whisky, . . . contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the state of Kansas." That this is defective, cannot be doubted. If seasonably challenged, the proceeding must have stopped, or at least an amendment must have been made. Perhaps it is so defective that a motion in arrest of judgment ought to have been sustained, though it is unnecessary to consider and pass upon that question. But still, it is not such an absolute nullity as not to challenge judicial consideration and action. And therefore the judgment of conviction cannot be pronounced void. (*Burke v.*

*Wheat*, 22 Kas. 722; *Bryan v. Bauder*, 23 Kas. 95; *Hodgin v. Barton*, 23 Kas. 740.) Hence no relief can be granted by *habeas corpus*. (Civil Code, § 671, second clause.)

This disposes of all the questions in these cases. The petitions for *habeas corpus* will be denied; the judgment in the appeal case of The State v. Charles Grieve and William Grieve, affirmed; and the judgment in the case of The State v. Reinhardt Ehret, reversed, and the cause remanded for further proceedings in accordance with the views herein expressed.

All the Justices concurring.