St. Louis Southwestern Railway Company *v.* Kavanaugh,

Opinion delivered July 9, 1906.

1. Constitutional amendment—adoption—evidence.—Const. 1874, art. 6, § 3, requires the returns for the election of Governor, Secretary of State, Auditor, Treasurer and Attorney General to be sealed up separately and transmitted to the Speaker of the House of Representatives, who during the first week of the session shall open and publish the vote cast for each of the candidates for said offices in the présence of both houses of the General Assembly. Kirby's Digest, §§ 716-718, requires the vote on constitutional amendments to be separately sealed and delivered to the Speaker at the same time and manner as provided in the case of the returns for Governor and other State officers, to be opened and counted in the presence of the General Assembly in joint convention; and that if a majority of the electors voting at such election adopt such amendment, then the Speaker shall so declare. *Held,* that the act contemplated that, in determining whether there was a majority of the electors voting

at a general election in favor of a particular amendment, the Speaker shoud consider as evidence only the votes cast for the five officers above named.   (Page 471.)

2.  Same—Test of Majority.—Const. 1874, art. 19, § 22, providing that amendments to the Constitution shall be submitted to the electors at a "general election for senators and representatives," and that "if a majority of the electors voting at such election" adopt such amendment it shall become part of the Constitution, did not intend that the vote on senators and representatives should be the test as to whether "a majority of the electors voting at such election" voted for the amendment.   (Page 473.)

3.  Same—Legislative Rule of Evidence.—Though it is a judicial, as distinguished from a political, question whether an amendment to the Constitution has been adopted, yet, since the constitutional provision (art. 19, § 22) is not self-executing, the Legislature may prescribe such rules of evidence for determining whether it has been adopted by the required vote as reasonably tend to prove its adoption by the required majority.   (Page 474.)

4.  Same—Majority of Electors—Test.—The vote for the five State officers required to be returned to the Speaker of the House, which is adopted by the Legislature as the test for determining whether or not a particular amendment has received the constitutional majority, affords a fairly accurate method of determining that question, and therefore the statute adopting it (Kirby's Digest, § § 716-718) is constitutional.   (Page 477.)

Appeal from Pulaski Chancery Court; *Jesse C. Hart,* Chancellor; affirmed.

*S. H. West* and *Bridges & Wooldridge,* for appellant.

1.   The Constitution nowhere provides for a method of ascertaining the result of the vote upon an amendment.   Hence the Legislature is without authority to pass an act prescribing the method of arriving at the result of the vote upon an amendment to the Constitution that would, within itself, be conclusive upon the courts in inquirng into the legal adoption of such amendment. *Rice* v. *Palmer, ante* p. 355; 48 L. R. A. 655.

2.   Since the Constitution requires a majority of all the electors voting at a general State election, the statute limiting the inquiry to a majority of those voting for the five constitutional offices is to that extent defective and unconstitutional.   Cases *supra;* 156 Ind. 104; 51 L. R. A. 722, 725; 138 Mo. 187; 51 Neb. 805.

*James P. Clarke, J. C. Marshall, Gray & Gracie* and *Fulk, Fulk & Fulk,* for appellee.

1.   Action by the legislative department is necessary to supplement the constitutional provisions, and to give effect to the constitutional right of amendment.   Within the limits of legislative discretion, the lawmaking power is supreme, and the courts concede and respect it.

2.   That which is implied in a statute is as much a part of it as if specifically expressed.   103 Fed. 420 and cases cited.   Every provision of the statute, and the contemporaneous history of its enactment, plainly show the purpose of the Legislature to make the vote cast for the five constitutional officers the standard for ascertaining the number of electors voting at such election, and the courts will respect the standards thus established.   134 Fed. 423; 45 Ark. 409; 69 Ark. 436; 28 Ark. 328; 15 Kan. 500.   For rules adopted by the courts under similar constitutional provisions, where no method was established by the statute of ascertaining the number of electors who voted at such elections, see 71 N. W. 779; 70 N. W. 252; 26 Neb. 517.

HILL, C. J.   This appeal questions the validity of Amendment No. 5 to the Constitution, commonly called the "Road Tax Amendment," which was declared adopted by the Speaker of the House of Representatives on the 13th day of January, 1899, and duly certified and proclaimed as part of the organic law. The Constitution, art. 6, sec. 3, requires the returns for the election for Governor, Secretary of State, Auditor, Treasurer and Attorney General to be sealed up separately and transmitted to the Speaker of the House of Representatives, who, during the first week of the session, shall open and publish the vote cast for each of the candidates for said offices in the presence of both houses of the General Assembly.

The act of March 1, 1883 (p. 70), as modified by the general election law of 1891 (now sections 716-718, Kirby's Digest) requires the vote on amendments to be separately sealed and delivered to the Speaker and opened, and the result as it appears from the returns then before him ascertained and declared at the same time the vote on said offices is opened and published.   When this was done in regard to the amendment in question, it was found that there were 27,209 votes for the amendment and 24,071

votes against it, and the highest vote cast for the candidates for any of the five offices then before the Speaker was for the office of Governor; the total vote cast for the four candidates for that office being 111,897. A simple calculation demonstrated that the amendment received a large majority voting on that question, and received 1260 more votes than a majority of electors voting for any of the said State offices, and the Speaker, on these returns, declared the amendment to have been adopted.

To overcome this result, the appellant shows from the returns on file with the Secretary of State that if the highest vote cast in each county for any office voted for is taken as a basis, and these highest votes aggregated, 116,378 electors voted for some officer at said election, and that therefore the amendment lacked 970 votes of receiving "a majority of the electors voting at such election." The Speaker had none of these county returns before him, showing that there were more votes cast than appeared from the returns before him on the said State officers.

This court recently said, in regard to the Speaker's duty in this matter: "The votes on the principal State officers were then before him, and from them he could reach, at least approximately, the votes in the election, and the votes on the amendment would give the other necessary data to a *prima facie* decision from the face of the returns, and, in the language of Judge Cooley, 'the final decisions must rest with the courts.'" *Rice* v. *Palmer*, *ante*, p. 432.

In the Rice-Palmer case the Speaker had declared Amendment No. 3 adopted, although the votes before him showed that it did not receive a majority of the electors voting for any of said State officers. The Speaker was acting upon the erroneous theory that the vote upon the question of the amendment alone controlled. The court held that the decision of the Speaker was not a finality; and where it was shown to be wrong, as in that case, the courts must declare the true result. Now, this is a case where the Speaker acted correctly on the returns before him; and, as the integrity of the returns were not and are not questioned, the only point for decision is whether the Speaker, and the courts, will be bound to confine the evidence of the "majority of the electors voting at such election" to the votes cast for said

five officers, or shall the courts receive evidence that more electors voted in the said election ·on other offices or questions than upon the offices whose votes were before the Speaker?

It was the evident purpose of the act of 1883 to confine the evidence to the votes sent to the Speaker. The act does not in terms so declare; but, when read in the light of the history of legislation on this subject, all doubt as to this fact is removed. The clause of the Constitution providing for the submission of constitutional amendments (art 19, § 22) was not self-executing, and required legislation to effectuate its purpose. The General Assembly of 1879 provided the machinery for amending the Constitution, and the same assembly submitted to the electors Amendment No. 1, commonly called the "Fishback Amendment." This act required the election judges to count the votes for the amendment separately from the offices, but to return the same with the other returns to the county clerk, and the clerk was required to separately abstract the vote, but to make the return of it to the Secretary of State in like· manner as the returns on the candidates voted for. It was then provided that when all the returns were in the office of the Secretary, the Governor, Secretary of State and Attorney General should canvass the vote; "and if it be found that a majority of the votes (voters) of the State voting at such election have voted for any such amendment, the officers herein directed to canvass the same shall certify the facts," etc.

In the general election of 1880 the Fishback amendment received a large majority of the votes cast on the subject, and a clear majority of the votes cast on the State office receiving the highest vote. But the count was not based on any of these votes. It was thus explained by the Secretary of State: "As no provision was made by law for ascertaining the actual number of votes cast at the election of September 6, as contemplated by the Constitution, in order to ascertain the same, I addressed a circular letter to all the county clerks in the State, in which they were required to certify to this office the actual number of votes cast at each and all the precincts in the several counties, as shown by the poll books of each and every precinct in each county." See Public Documents of Arkansas, 1880-1881, pages 17 and 18. The aggregate vote made up in this way demonstrated that the

amendment had not received "a majority of all the electors voting at such election," and it was declared "defeated." See *Id.* pages 34-38. Hempstead's History of Arkansas, pages 281, 283.

This result was very unsatisfactory to the supporters of the Fishback amendment, and its adoption and a different method of ascertaining the vote upon amendments became public questions of moment. The General Assembly of 1883 resubmitted the amendment to the electors, and the same assembly repealed this act of 1879, and substituted the present system therefor, which, briefly stated, segregates the vote on the amendments from all the other returns except said five offices which are the only returns going before the General Assembly, and required the Speaker from the votes then before him to declare the result of the election on the amendment. This bit of history explains this legislation, and points its evident purpose.

While the Speaker's duty is perfunctory, and confined to narrow lines, yet it is contemplated that he shall have the true basis to ascertain the result, which he must declare, and this basis must be accepted by the courts, as well as the Speaker, if it was competent for the Legislature to create this basis as the only evidence of the number of electors voting in the election for the purpose of deciding whether or not an amendment has been adopted.

The court has held that it was a judicial, as contra-distinguished from political, question whether the Constitution has been amended in the manner prescribed by the Constitution itself. In other words, that it is the paramount duty of the court to see that the constitutional requirements have been fulfilled. But this holding is far from deciding that the Legislature can not prescribe the rules of evidence for reaching the question at issue. The case then resolves itself into an inquiry whether the rule of evidence furnished is a reasonable compliance with the Constitution, or whether it is an evasion of it.

Appellant's counsel frankly meet the issue, and the force of their argument in brief and at bar is in the contention that the act of 1883 is unconstitutional. They contend that holding the question to be a judicial one lets in any competent evidence to establish the fact that more electors voted in the general election than appeared from the votes given on the amendment and

on the five offices whose vote goes to the General Assembly. The evidence they offer is practically of the same kind which the canvassing board received when it declared the Fishback amendment defeated in 1880, and to avoid which the act of 1883 was passed. Recognizing this act as an obstacle in the way of their position, they say it must be stricken down as unconstitutional. If, in truth, it is unconstitutional, the court must so declare, and then any competent evidence to prove the fact in issue would be admissible. Passing then to the clause of the Constitution invoked, it is found that it can not be literally construed. It describes the election as the "general election for senators and representatives." The vote on senators and representatives can not be taken because only one-half of the State votes on senators in each biennial election, and many counties, like Pulaski and . Sebastian, have more than one representative, and it is practically impossible to tell the number of voters participating in such contest. But the Constitution did not mean to be taken literally. The term was intended to be descriptive, not definitive, of the election, and meant the general election at which senators and representatives were elected. It is a matter of great difficulty to obtain the evidence of the number of electors voting in a general election.

No basis can be obtained which will yield the exact truth in such a matter. The appellant says that if the Legislature required the election judges of each precinct to return to the county commissioners the total number of votes cast as shown by the poll books, and the county commissioners were then required to return the total number of votes in each county to the Secretary of State or the Speaker, together with the vote on amendment, this would give the total number of electors voting in the State, and with such returns it could be easily and accurately determined whether or not the amendment received the required majority.

This method could have been adopted by the Legislature, and it looks like the natural method to adopt to comply literally with the Constitution; but even this method is only an approximation. It is common knowledge that many electors vote a blank ticket, and others vote defective tickets, and they are not counted as voting in the election, but would be counted as voting on the amendment under this plan, as this number would increase

the majority required to be reached to adopt the amendment.

An examination of the returns of any general election discloses this fact also: Many electors vote · on, the subject of license who do not vote for any office; they are only interested in the sale or prohibition of the sale of whisky. This is not voting in the "general election," within the meaning of this clause, and yet, if the method proposed was adopted, their votes would swell the total number of electors voting and' increase the majority required to be reached to adopt an amendment. The same may be true when one or more amendments are submitted. An elector may vote for or against one or more, and not vote otherwise in the election. Sometimes a hot contest for justice of the peace or constable will cause the electors to vote on those offices, and not touch the State or county ticket, and then electors frequently go to the polls to vote for a single individual. In a sense in all of these instances the electors participated in the election; but in a broader sense they were no more participants in the general election for State and county officers than the electors who passed by the polls without stopping to cast their ballots. In its final analysis no basis is exactly accurate in these matters.

The Constitution of Kansas contained this clause: "No county seat shall be changed without the consent of a majority of the electors of the county." The Legislature enacted a statute making the number of votes cast the evidence of the number of electors in the county. Manifestly, this was no nearer the true yard stick than the one furnished in the case at bar. The Supreme Court of Kansas, speaking through that eminent jurist, Mr. Justice Brewer, then associate justice of that court, said: "Doubtless, the Legislature might make other things evidence of this fact. It might require, as preliminary to every election, a registration, and make that registration the evidence. We do not mean that it may, by the mere machinery of the rules of evidence, override or set at naught the restrictions of the Constitution, or that it could arbitrarily make conclusive evidence of the number of voters any list, or roll, which in the nature of things has no connection with that fact, and does not reasonably tend to prove it. But when it adopts as conclusive evidence of the fact anything which, according to the rules of human experience,

reasonably tends to prove the fact, the courts are not at liberty to ignore or go behind such evidence." *County Seat of Linn County,* 15 Kan. 500.

The Constitution of 1874 provides: "For every two hundred electors there shall be elected one justice of the peace, but every township, however small, shall have two justices of the peace." The General Assembly in 1893 passed a statute declaring that, in ascertaining the number of justices of the peace to be voted for and commissioned, the number of votes cast in the preceding general election should be taken as conclusive evidence of the number of electors in the township. It was found that, according to the vote at the election in question, there were 1800 electors, but at the preceding election only 1346, and it was contended that the Legislature could not make the number of votes at a preceding election control when the last vote furnished evidence that the township was entitled to two more justices. This court, speaking through Chief Justice BUNN, said: "It was the duty and within the province of the Legislature to adopt some method of determining the number of electors in a township, in order to determine therefrom the number of justices of the peace to which it is entitled; for, without the establishment of such a method, there could be no election of certain validity. The plan adopted by the act of 1893 is certainly not accurate, for changes in the number of electors are at least liable to take place within two years; but the question really addressed to the Legislature was, not to adopt a perfect method, but the most perfect available under the circumstances. In its final conclusion on the subject, it doubtless reasoned that the harm that might be done by the adoption of the best available, but inaccurate, method would be by no means equal and commensurate with the evil arising from the absence of all method, or from the expense and inconvenience of endeavoring to make everything subservient to mere accuracy. * * * In other words, the act in question was doubtless the embodiment of the very best methods the Legislature could conceive under the circumstances. This being the case, we do not feel at liberty to declare the enactment unconstitutional." *Alford* v. *State,* 69 Ark. 436.

Applying these principles to the act under review, it seemed to the Legislature that this was the best available method, even

if inaccurate, because the other method had been tried and found unsatisfactory and uncertain in these particulars:

1.    It left the evidence of adoption to depend upon the vote for so many offices, largely local, that it was difficult of ascertainment; and, when ascertained, liable to be unsettled by a local contest or a series of local contests. It was certainly an unstable basis for a part of the organic law to rest upon.

2.    While the Constitution requires the affirmative vote of a majority of the electors voting in the general election to adopt an amendment, yet it contemplated a majority of those really participating in the "general election for senators and representatives;" but the method pursued enabled those who voted merely on license or the amendment, or some one county or township candidate, to so swell the total vote that an amendment supported by a good majority of electors voting for State officers was defeated.

The system having worked unsatisfactorily, the General Assembly of 1883 sought to remedy what it conceived to be a mischief in the act of 1879, and presented this rule of evidence to govern the ascertainment of the number of electors voting in the election. Can this be said to be "mere machinery of rules of evidence" to "override or set 'at naught the restrictions of the Constitution?" If it is, the court must annul it; but if it "has a connection with the fact, and does reasonably tend to prove it," it must be sustained. Instead of taking one vote on one office, as is done in some States, this act takes the vote on the five principal executive offices as the test. This guards against unpopular candidates for any one office reducing the vote below a fair average. The vote on these offices would naturally excite the greatest interest, and therefore call for the largest vote. The evident purpose is not to evade the highest vote, but to secure the highest vote by taking the offices where such vote is to be expected.

The various county returns could be used, but would not their uncertainty in involving so many more factors, and their liability to be upset in contests over which the Legislature had no jurisdiction or cognizance or information, render this unwise? Would not the reasoning in *Alford* v. *State, supra,* apply to this? "In its (the Legislature's) final conclusion on the subject,

it doubtless reasoned that the harm that might be done by the adoption of the best available, but inaccurate, method would be by no means equal and commensurate with the evil arising from the absence of all methods, or from the expense or inconvenience of endeavoring to make everything subservient to mere accuracy?" The inaccuracy may or may not be great under the act of 1883. If there is a large number of voters on single candidates on the township or county ticket or the questions on the ballot who do not vote the State ticket, it may be large; on the other hand, it is susceptible of being absolutely accurate; and, as the inaccuracy can only be made great by those who do not fully participate in the general election, their exclusion from the count can not offend the spirit of the Constitution. In the election at bar the inaccuracy was not great, and there is no special circumstance to mark this election as one out of the ordinary. The certificate in the transcript shows that in one-third of the State the greatest vote was cast for one or another of those five offices; and an examination of the full returns shows no great differences between the office receiving the highest vote and some one of those State offices. In some instances the difference is less than a half dozen.

Taking it "by large and by small," there is no reason why the vote on these offices should not be a fairly accurate method of reaching the number of electors voting in the general election. Certainly, its inaccuracy is not so great that it shows a purpose of defeating, instead of effectuating, the object of the Constitution: The language of Mr. Justice BREWER is applicable: "When it (the Legislature) adopts as conclusive evidence of the fact anything which, according to the rules of human experience, reasonably tends to prove the fact, the courts are not at liberty to ignore or go behind such evidence."

It also has merits which would justify the Legislature in sacrificing a small degree of accuracy to safeguard this gravely important matter. This method offers a certain and fixed standard; the evidence is in highest form and submitted and inspected in the forum of the people—a joint session of the General Assembly.

On the whole, this act is considered a fair and substantial fulfillment of the Constitution, and seems to make the constitutional requirement as to the number of electors voting in the

election more stable; and thereby the will of the framers of the Constitution is the better effectuated.

The judgment is affirmed.

Mr. Justice RIDDICK concurs in the judgment.