HILDRETH *v*. TAYLOR.

Opinion delivered March 22, 1915.

1. CONSTITUTIONAL LAW—AMENDMENTS—VALIDITY OF PASSAGE—JUDICIAL QUESTION.—Where the validity of the adoption of an amendment to the Constitution is in issue, on the grounds that notice of the submission was not given by advertisement in a newspaper, as required by statute, and that the amendment did not receive the number of votes requisite for its adoption; *held*, these issues are judicial in their nature, and if the amendment to the Constitution was not legally adopted, it becomes the duty of the court to so declare; the declarations of the result made by the presiding officers of the two branches of the General Assembly, are not conclusive.

2. INITIATIVE AND REFERENDUM — CONSTITUTIONAL AMENDMENT — ENABLING ACT—PUBLICATION OF NOTICE—SUBSTANTIAL COMPLIANCE.—The Enabling Act, Public Acts 1911, page 582, which regulates the submission of measures to the people, under the Initiative and Referendum Amendment to the Constitution, and requires the publication of the proposed measure in every county within the State within a certain time, does not require a literal compliance as to the time of publication, and a failure to publish the notice within the time specified, will not, of itself, prevent the people from adopting a measure at an election, as specified in the Constitution.

3. INITIATIVE AND REFERENDUM—CONSTITUTIONAL AMENDMENTS—ADOPTION—MAJORITY VOTE.—An amendment to the Constitution, when initiated by the people under Amendment No. 10, the initiative amendment, must be voted for by a majority of all those voting at the election, and a majority of those voting on that question is insufficient.

4. STATUTES—BORROWED CONSTRUCTION.—Where a constitutional amendment is almost literally borrowed from a similar constitutional amendment of another State, there is a presumption that a construction of it in that State, is also borrowed.

5. INITIATIVE AND REFERENDUM—VETO POWER OF GOVERNOR.—The governor is without power to veto an initiated measure.

6. INITIATIVE AND REFERENDUM—CONSTITUTIONAL AMENDMENT—AMENDMENT—MAJORITY VOTE.—The provision in Amendment No. 10, that "any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon and not otherwise," does not change the law that an amendment to the Constitution, to be adopted, must receive a majority of the votes cast at the election, and applies to legislative acts, referred to the people.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; reversed.

*Hal L. Norwood, Ratcliffe & Ratcliffe, Moore, Smith & Moore, Morris M. Cohn* and *J. C. Marshall,* for appellants.

1. The notice of the submission was not given by advertisement in a newspaper as required by statute.

2. The amendment did not receive the number of votes requisite for its adoption. The amendment was not legally adopted. 106 Ark. 506; Const., art. 19, § 22; *Ib.,* art. 6, § 15; Amendment No. 10; 93 Pac. 254; 78 Ark. 346; 98 *Id.* 125; 104 *Id.* 417; Endlich on Int. of Stat., 747; 74 Pac. 721; 105 Ark. 381; 104 *Id.* 583; 106 *Id.* 63; 93 *Id.* 228; 27 *Id.* 648; 60 *Id.* 343; 12 *Id.* 101; 2 *Id.* 98; 4 *Id.* 473; 9 *Id.* 270; 78 *Id.* 442; 24 Ala. 108; 50 L. R. A. (N. S.) 196; 61 Ark. 594; 76 *Id.* 534; 106 *Id.* 248-253; Kirby's Dig., § § 702, 710, etc.; 98 Pac. 241; 34 Utah 369; 98 Pac. 180; 96 *Id.* 1047; 58 S. E. 715; 92 Pac. 353; 100 N. E. 833; 115 N. W. 429; 70 Ark. 326; 79 *Id.* 236; 156 Ky. 783; 162 S. W. 99; 25 L. R. A. (N. S.) 560; 19 Pac. 894; 24 Ala. 108; 104 Ark. 510; 78 *Id.* 422; 106 Ark. 506-508; 78 *Id.* 442.

*J. W. Mehaffy, Coleman & Lewis, Cockrill & Armistead* and *Rose, Hemingway, Cantrell, Loughborough & Miles,* for appellee.

1. The notice was sufficient. The provision is not mandatory. The measure received a majority of the

votes cast thereon, and was legally adopted. "Referred to the people" applies to initiative measures. Amendment No. 10; 93 Pac. 237. "Measure" includes a constitutional amendment. Thorpe, Am. Charters, vol. 6, p. 3404; 7 *Id.* 4278; 109 Pac. 823; 11 *Id.* 802; 109 *Id.* 658; 124 Pac. 176; 114 *Id.* 293; Cooley, Const. Lim., 76; 20 N. E. 461; 8 Cyc. 736; 15 Ark. 675; 52 *Id.* 339; 80 *Id.* 374; 85 *Id.* 95; 50 *Id.* 266; *Ib.* 278; 132 Mass. 289; 15 O. St. 532; 33 Ark. 716; McCrary on Elections, § 150; 146 N. W. 785; 104 Pac. 56. The electors had *actual* notice. 50 Ark. 277; 36 *Id.* 450; 106 *Id.* 512. This was sufficient.

McCulloch, C. J. (1) Each of these cases involves the inquiry whether or not proposed Amendment No. 14 to the Constitution, authorizing cities and towns to issue bonds, was legally adopted. In each of the cases a citizen and taxpayer of the city of Little Rock has sought to restrain the mayor and city council from taking steps toward the issuance of bonds. The validity of the amendment is attacked on two grounds: First, that notice of the submission was not given by advertisement in a newspaper as required by statute; and, second, that the amendment did not receive the number of votes requisite for its adoption. Both of these questions are judicial in their nature, for if the proposed amendment to the Constitution was not legally adopted, it becomes the duty of the court to so declare. The declarations of the result made by the presiding officers of the two branches of the General Assembly are not conclusive. *Rice* v. *Palmer*, 78 Ark. 432; *St. Louis S. W. Ry. Co.* v. *Kavanaugh*, 78 Ark. 468; *Grant* v. *Hardage*, 106 Ark. 506.

We will address ourselves first to the question of giving notice, or, stating the proposition as argued by counsel in the case, whether or not the provisions of the statute concerning notice are mandatory. The amendment itself is silent on this subject, but it contains a provision authorizing the General Assembly to pass laws prescribing the method of submitting to the people petitions for the initiative and for the referendum.

The General Assembly of 1911, at the extraordinary session, enacted what is popularly known as the Enabling Act, Public Acts 1911, page 582, which undertakes to regulate submission of measures to the people under the initiative and referendum. Section 15 of the statute provides that not later than "the first Monday of the third month before any regular general election at which any proposed law, part of an act or amendment to the Constitution or measure referred is to be submitted to the people, the Secretary of State shall cause to be published in one newspaper in each county * * * for thirty days a true copy of the title and text of each measure to be submitted with the number and form in which the ballot title thereof will be printed on the official ballot." Another section provides that when any measure is initiated by a percentage of the people, in conformity with the Constitution as amended, the Secretary of State shall furnish the Attorney General a copy, and within ten days thereof the Attorney General shall return to the Secretary of State a ballot title for the measure. Petitions to initiate measures are required to be filed four months before the election at which they are to be voted on, and it so happens that that date occurred in the year 1914 on May 14, and the last day for publication under the Enabling Act fell on the 1st day of June. If, therefore, the Attorney General took the full number of days allowed to him for preparing the ballot title, it only left seven days before the date of publication, during which time the Secretary of State would have had to mail out the copy for the printer and it would have to be set up before the date of publication. It is conceded that the terms of the statute were not literally complied with in this instance; that the Secretary of State did not mail out the copies for publication until May 25, 1914, and that only in two counties were the publications made before the first Monday in June, in the other counties the publication being from three to thirteen days late. It is urged by learned counsel that this imposed the performance of

an almost impossible condition, and that to require literal performance would defeat the provisions of the Constitution itself. There is much force in the argument, we think, and the fact that a condition has been imposed by the Legislature which is, to say the least, difficult of literal performance, affords much reason for holding that it was merely directory, and not mandatory. It can be readily seen that strict compliance with that provision depends upon acts to be performed by nonofficials, and if it is held to be mandatory and given literal interpretation, it would mean that there is entrusted to those who are not public officials the duty of carrying out the terms of the act, thus leaving it possible for them by their own misconduct to prevent a submission of a measure to the people, and to defeat an expression of the popular will. If the act involved only the conduct of a public official, such as the Secretary of State, there might be more reason for assuming that the lawmakers, in reliance upon a discharge of public duty by that official, made the provision mandatory; but when we consider that this notice must necessarily go through and into the hands of many others, who may not always act under a strict sense of public duty, we can not presume that the Legislature meant to make the right to submit a measure to the people depend upon the strict performance of duty by all those individuals. The framers of the amendment to the Constitution did not see fit to put in a condition or provision about publication of notice, but left the whole subject to the will of the General Assembly. That delegation of power did not, however, constitute authority to adopt a regulation so strict in its terms as would defeat the purpose of the amendment itself.

Now, it is worthy of consideration that the lawmakers, in framing this provision, have not imposed any requirement for the preservation of the evidence of the notice. It contains no provision at all with reference to proof of the publication nor of preservation of that proof. It is true, the general statute on the subject of legal advertisement (Kirby's Digest, § 4924) provides

that the affidavit of the editor, proprietor, manager or chief accountant of a newspaper shall be sufficient evidence of a publication of any notice or advertisement required by law; but neither in that statute nor in the Enabling Act is there any express provision for preservation of the notice. It is inconceivable that the lawmakers would have imposed upon the Secretary of State a duty intended to be mandatory without making some provision for preservation of the evidence of his act so that the courts might take notice of his records and discover whether or not that duty has been discharged. This omission furnishes strong evidence that the lawmakers did not intend the provision to be mandatory.

The authorities on this subject are not entirely harmonious. This court is, however, committed to the rule, which is in accord with the great weight of authority, that, so far as concerns elections of officers, the failure to perform any duty such as giving notice does not deprive the electors of the right to choose public officials. In *Wheat* v. *Smith*, 50 Ark. 266, Chief Justice COCKRILL, speaking for the court, said: ''The right to hold the election in such cases comes from the statute, and the notice required to be given thereof is only a reminder to the people of what the law has otherwise provided. An omission to publish the statutory notice of the election does not, in such cases, affect its validity.''

It is argued that the rule thus announced does not apply to an election upon some proposition other than the selection of an officer. That contention is not without authorities to support it. *Janesville Water Co.* v. *City of Janesville*, 156 Wis. 655, 146 N. W. 784.

Cases cited by counsel for the appellants hold that provisions for notice are mandatory, and that they must be strictly complied with, otherwise the election is void. *McCreary, Governor,* v. *Speer,* 156 Ky. 783; *State* ex rel. *Woods* v. *Tooker,* 15 Mont. 8, 25 L. R. A. 560. Those were cases, however, where the Constitution itself, by way of condition upon which amendments may be made, required that notice must be first given; and the courts, following

the rule of presumption that all language in the Constitution itself is, in the absence of something showing a contrary intention, intended to be mandatory, held that the provision for notice must be treated as mandatory. The reasons in those cases do not apply here inasmuch as our Constitution, as amended on that subject, does not itself prescribe a condition concerning notice.

(2) The following cases, in addition to those already cited, bear with more or less directness upon the question of the interpretation to be placed upon provisions of this sort: *Seymour* v. *City of Tacoma,* 6 Wash. 427, 33 Pac. 1059; *Bauer* v. *Board of Denmark Tp.,* 157 Mich. 395, 122 N. W. 121; *State* ex rel. *Thompson* v. *Winnett,* 78 Neb. 379, 10 L. R. A. (N. S.) 149; Prohibitory Cases, 24 Kan. 700; *Hammond* v. *Clark,* 136 Ga. 313; *Town of Grove* v. *Haskell,* 24 Okla. 707, 104 Pac. 56. The doctrine of those cases is, we think, that effect is to be given to such provisions only to the extent of requiring substantial compliance, and that is as far as we are willing to go in determining the cases now before us. We do not mean to say that a total failure to give notice of any kind would not invalidate an election. On the contrary, the fact that the lawmakers have provided a method of compelling public officials, by writ of mandamus, to comply with their duty, with respect to the submission of these questions, shows that some importance was attached to the requirement; and if nothing is done at all toward giving the notice, and the people acquiesce in the omission, it might be held that it affected the validity of the election. But we do hold, at least, that a literal compliance is not required, and that a failure to publish the notice within the time specified does not of itself prevent the people from adopting a measure at an election as specified in the Constitution. In order to defeat the submission, it must at least be shown that the omission to publish amounted to such a radical disregard of the requirements imposed by the Legislature that it probably affected the result of the election. The Legislature has provided no record whereby the fact can be definitely

ascertained whether or not the publication has been made as directed, therefore it would be disastrous to hold that a statute or amendment to the Constitution could be defeated by showing that the publication in fact was not made in accordance with the specified terms.

We turn, then, to the second question presented, whether or not the proposed amendment received the necessary number of votes to legally adopt it. It may be well to set out Amendment No. 10 at this point of the discussion so that its provisions may be fully analyzed and considered. It reads as follows:

"Section 1. The legislative powers of this State shall be vested in a General Assembly, which shall consist of the Senate and House of Representatives, but the people of each municipality, each county and of the State, reserve to themselves power to propose laws and amendments to the Constitution and to enact or reject the same at the polls as independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly. The first power reserved by the people is the initiative, and not more than 8 per cent of the legal voters shall be required to propose any measure by such petition, and every such petition shall include the full text of the measure so proposed. Initiative petitions shall be filed with the Secretary of State not less than four months before the election at which they are to be voted upon.

"The second power is a Referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety), either by the petition signed by 5 per cent of the legal voters or by the legislative assembly as other bills are enacted. Referendum petitions shall be filed with the Secretary of State not more than ninety days after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded. The veto power of the Governor shall not extend to measures referred to the people. All elections on measures referred to the people of the State shall be had at the biennial regular general elections, except when the legisla-

tive assembly shall order a special election. Any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise. The style of all bills shall be, 'Be It Enacted by the People of the State of Arkansas.' This section shall not be construed to deprive any member of the legislative assembly of the right to introduce any measure. The whole number of votes cast for the office of Governor at the regular election last preceding the filing of any petition for the initiative or for the referendum shall be the basis on which the number of legal votes necessary to sign such petition shall be counted. Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State, and in submitting the same to the people, he and all other officers shall be guided by the general laws and the acts submitting this amendment until legislation shall be specially provided therefor.''

According to the returns as made to the Speaker of the House of Representatives and the Secretary of State, in accordance with the election laws of the State, there were cast 135,517 votes for Governor, and other State officers at the general election in September, 1914, and of this number 54,782 votes were cast in favor of Amendment No. 14, and 40,441 votes against it. It will thus be seen from the record that the proposed amendment received a majority of the votes cast upon that question, but not a majority of the votes cast at the election. Section 22, article 19, of the Constitution, which provides for submission of constitutional amendments by the General Assembly, specifies that ''if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this Constitution.'' If it be held, therefore, that the provisions just quoted apply to an amendment proposed on the initiative of a percentage of the people, Amendment No. 14 did not receive a sufficient number of votes to adopt it.

It is contended, however, by learned counsel for appellees, that Amendment No. 10 specified a different rule with reference to amendments initiated by the people,

and they base their argument upon the following language found in the amendment: "Any measure referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise." The contention is that the language just quoted is broad enough to cover measures of every kind, statutes and amendments to the Constitution initiated by the people, as well as referred bills of the General Assembly. It is argued that the word "referred," as used in that connection, means all measures submitted to the people in any manner under the provisions of Amendment No. 10. A consideration of the sentence quoted above, when viewed in its connection with the other parts of the amendment, does not, we think, bear out that contention. Any argument that can be made in support of the view that that sentence includes anything more than legislative bills referred to the people is erroneously based upon the assumption that the people by framing and adopting this amendment intended to tear away all other provisions of the Constitution and substitute this in place. The argument is necessarily based upon the idea that Amendment No. 10 is revolutionary, and that every sentence contained therein must be considered without reference to its relation to the provision of the unamended Constitution. This is, we think, an entirely erroneous view to take of the amendment and the design of the people in adopting it. We have said in other cases dealing with the provisions of the amendment that it was intended to take its place in the Constitution as other amendments and to be considered with reference thereto, and that it only repealed other provisions which are found to be necessarily repugnant. *Hodges* v. *Dawdy,* 104 Ark. 583; *State ex rel.* v. *Donaghey,* 106 Ark. 56; *Grant* v. *Hardage, supra.*

(3) In *State* ex rel. v. *Donaghey, supra,* we held in reference to the provision of the Constitution limiting constitutional amendments to be submitted at one election to three in number that that provision was not re-

pealed by Amendment No. 10, but applied to amendments initiated by the people as well as those referred by the Legislature. In disposing of that question we said: "It was not the purpose nor the intention of the people in the adoption of Amendment No. 10, the Initiative and Referendum Amendment to the Constitution to abrogate and destroy the Constitution of the State, the framework of its government, by substituting therefor the provisions of said amendment. * * * There is no intimation in it of an intention to propose or adopt amendments to the Constitution, independent of the provisions of the Constitution, nor otherwise than in accordance with its requirements, as modified by the amendment." It is our duty, therefore, to give this amendment a reasonable interpretation in the light of other provisions of the Constitution, and to determine, according to the ordinary canons of construction, what the language of the Constitution really means. When its language is carefully considered and analyzed, we think there can be no doubt that it does not contain any provision specifying the number of votes necessary to adopt an amendment, and that that must be left to pre-existing provisions of the Constitution. Little reason can be discovered for requiring a less number of votes to adopt an amendment proposed by the voters themselves, than one proposed by the General Assembly. All that the amendment accomplished with respect to amendments to the Constitution is that the people may initiate them with like effect as those proposed by the General Assembly. It leaves in full force the provisions of the Constitution requiring the majority vote of those voting at the election.

(4) One of the convincing things which leads to that conclusion is that the language of the amendment was in substance, nay almost literally, borrowed from a constitutional amendment adopted by the people of another State, and that there is a presumption that the construction of it in that State was also borrowed. The amendment was copied from a like one which was adopted by the people of the State of Oregon in the year 1902. The

language is nearly identical, but not quite so. The few changes do not relate at all to this question. There does not seem to have been any judicial determination in that State of the question whether or not it required a majority of the votes cast at the election to adopt an amendment, but such, evidently, was the popular interpretation, for in the year 1906 another amendment was adopted which expressly provided that a proposed amendment to the Constitution, initiated by the people, could be adopted by a majority of those voting on the question. Our amendment was framed by the General Assembly of 1909, and it framers took the original form of the Oregon amendment without including the amendment which was there thought to be necessary to give the right of adoption merely by a vote of a majority of those voting on the question. The inference is therefore strong that it was not intended to so frame the amendment as to change the rule here with respect to the majority necessary to amend the Constitution. If such had been the intention, it would have been easy to make it clear by explicit language about which there could be no doubt. We think, therefore, that the rule concerning adoption of a borrowed construction is applicable.

But is is by no means necessary to rest the case upon the application of that principle for the reason that there are so many other indications in the amendment, when considered as a whole, which show that the framers did not have it in mind that the words ''measure referred to the people'' were to be interpreted as meaning all amendments to the Constitution submitted in any manner. The section is easily divisible into paragraphs. The first one, after defining the legislative power of the General Assembly, relates both to the initiative and referendum features and states broadly the reservation by the people to themselves of the power ''to propose laws and amendments to the Constitution and to enact or reject the same at the polls as independent of the General Assembly,'' and also the ''power at their own option to approve or reject at the polls any act of the Legislative Assembly.'' The word ''laws'' was obviously used as

meaning statutes in contradistinction to amendments to the Constitution, and it is significant that in the later sentence, which we are called upon to construe, the framers of the amendment wrote of laws but made no reference specifically to amendments to the Constitution, which shows that the later sentence was not intended to cover amendments to the Constitution and had reference only to statutes referred under the referendum feature of the amendment. Another significant thing is that the first paragraph uses the words "enact or reject" with regard to initiated measures, but uses the words "approve or reject" when dealing with acts of the General Assembly referred to the people. Now, the sentence under consideration, which concerns the number of votes, speaks only of approval by a vote of the majority, thus making use of the word which had in the preceding sentences been applied to acts of the General Assembly referred to the people. The next two sentences, which were manifestly intended to constitute a paragraph, refer entirely to the power reserved by the people through what is termed the initiative, and specifies the percentage of voters necessary to propose a measure and the time within which it must be filed with the Secretary of State. Then begins another paragraph which deals entirely with the power of the people through what is termed the Referendum, and it is manifest that that paragraph continues down to the one which relates to the style of bills and includes the sentence now under consideration which speaks of the number of votes necessary to approve a law. If it be construed otherwise, that sentence would have to be treated as being coupled with the one which relates to the style of bills, and would make that, too, relate to legislative measures as well as initiated measures. This court held to the contrary in the case of *Ferrell* v. *Keel,* 105 Ark. 380, where it was decided that the sentence defining the style of bills related only to those initiated by the people. It was said in that case that the framers of the amendment when using that sentence had in mind only the question of reserving the power of the

Initiative and were not dealing with the question of legislative bills.

(5-6)   It is argued that the sentence about the veto power of the Governor breaks the continuity of the paragraph when considered as dealing alone with the matter of the Referendum, and that that sentence must be treated as necessarily applying to initiated measures, otherwise the Governor would have the power to veto them.   Such, however, is plainly not the case because the Governor, even without this sentence, would have no power to veto an initiated measure.   There is no inherent power in the executive to veto even legislated bills, and the power is derived only from the Constitution itself which provides that bills passed by the houses of the Legislature shall be presented to the Governor and that he may veto the same.   If Amendment No. 10 was entirely silent as to the veto power of the Governor, he would have no right to veto an initiated bill.   The sentence concerning the veto power relates exclusively to legislative bills which are referred by the Legislature itself to the people.   Of course, it has no reference to bills passed by the Legislature and not referred by that body, because if the Governor vetoes them that is the end of the matter and there can be no reference to the people.   If, however, this provision had been omitted, the Governor could veto bills which were by the Legislature referred to the people and thus prevent a reference, and it was the plain intention of the framers of the amendment to prevent that and to allow the General Assembly, without the concurrence of the Governor, to refer measures to the people.   Nor can it be said that the next sentence, specifying the election, can be treated as using the words "measures referred" relative to initiated bills.   That sentence clearly relates to legislative bills referred to the people, for it is not to be supposed that the framers of the Constitution thought it appropriate to give the Legislature power to provide special elections before it was known whether or not any measure was to be initiated or referred.   Our conclusion

is that the sentence specifying the majority necessary to adopt was put in mainly for the purpose of suspending the operation of a legislative bill referred to the people, and that it only provided for such a law going into effect when approved by a majority of votes cast thereon. The addition of the words "and not otherwise" manifests beyond doubt the intention to make this apply only to legislative bills referred, otherwise these words would be meaningless, for, of course, an initiated bill could not in any event become a law until it is approved by the people at an election.

It is said that the argument of counsel for appellants is based entirely on a confusion in the use of the word "refer" in the amendment with the term "referendum," but it seems to us that the argument does not involve any such confusion. The word "referendum" has a well known significance, and it is by no means new. Mr. Webster defines it as follows: "The principle or practice of referring measures passed upon by the legislative body to the body of voters, or electorate, for approval or rejection, as in the Swiss cantons (except Freiburg) and in various local governments in the United States, and also in the local option laws, etc.; also the right to so approve or reject laws, or the vote by which this is done. *Referendum* is distinguished from the *mandate,* or instruction of representatives by the people, from *direct government* by the people, in which they initiate and make the laws by direct action without representation, and from a *Plebiscite,* or popular vote taken on any measure proposed by a person or body having the initiative but not constituting a representative or constituent body." Now, that word was used advisedly by the framers of Amendment No. 10, and the use of the word "referred" in the sentence now under consideration shows that it was intended to apply to those measures which were submitted to the people under the referendum. In other words, the framers of this amendment observed clearly the distinction between the two powers reserved by the people, one through the Initiative and the other through the Referendum, and the exercise of those powers was

designedly kept separate, except in the two instances specified about the basis for determining the requisite number of signatures on a petition and also the power of the Legislature to provide the method of submission. It would therefore be doing violence to the design of the framers of the amendment to attribute to them an intention to require a less number of votes to adopt an amendment proposed by the people through the power of the Initiative than one submitted by the General Assembly.

It is earnestly insisted that this view of the matter leaves Amendment No. 10 without any specification at all as to the number of votes necessary to enact or adopt an intiated bill. That is true, but it does not follow that that feature of the amendment would in the absence of enabling legislation fail because there is no such specification. This is a government of majorities, or rather of plurality of the votes cast on any given question, unless there is some contrary specification in the organic law; and when the framers of the amendment provided for the exercise of the Initiative and the submission of laws to the people through that agency, they necessarily meant that the majority of those voting on any particular question should control. That, however, does not apply to the adoption of amendments to the Constitution, for the obvious reason that the Constitution itself provides another rule, and the framers of this amendment are presumed to have omitted any other provision in recognition of the force of that provision.

We are of the opinion, therefore, that the majority of all votes cast at the election, as shown by the returns, is necessary to adopt a proposed amendment to the Constitution initiated by the people, and that in this instance the proposed amendment has not received such majority, and that therefore it is not legally adopted. The declaration of the Speaker of the House of Representatives was therefore based upon a misconception of the law and has no binding force when we come to consider as a judicial question the matter of the adoption of the amendment. *St. Louis Southwestern Ry. Co.* v. *Kavanaugh, supra.*

The chancellor erred in dismissing the complaints in these cases, and the decree in each case is reversed and the causes remanded with directions to enter decrees in accordance with the prayers of the complaints.