MARGARET FAHEY v. GEORGE E. HACKMANN, State Auditor, Appellant.

In Banc, January 7, 1922.

1. **CAPACITY TO SUE:** Taxpayer: Injunction: To Prevent Issue of State Bonds.  A resident of Missouri, who is a taxpayer and the owner of real estate situate in the State, legally assessable for state and county taxes, has legal capacity to maintain a suit in equity in the proper court, to enjoin the State Auditor from issuing and selling bonds of the State authorized by a constitutional amendment and an act of the Legislature, on the ground that said amendment was not legally ratified, and said act was not legally enacted.

2. **CONSTITUTIONAL AMENDMENT:** Publication for Three Weeks in One County.  The Constitution providing that a proposed amendment shall be "published weekly in some newspaper, if such there be, within each county in the State, for four consecutive weeks next preceding the general election then next ensuing," it will not be held that, because the proposed amendment was published for three weeks only in one county, but for the required four weeks in all the other counties, it was not constitutionally submitted to the voters.  The omission to publish the proposed amendment for one week in one county did not make void the publication for four consecutive weeks in all the other

counties, nor render its ratification by the voters illegal. Especially should such be the ruling where, if all the votes cast in such county both for and against the amendment were eliminated and deducted from the aggregate number of votes cast in the entire State, there would still remain a constitutional majority in favor of ratification.

3. ———: **At Special Election.** Since the amendment to Article XV of the Constitution adopted on November 2, 1920, an amendment to the Constitution may be submitted and adopted at either a special or a general election.

4. ———: **Excessive Indebtedness: Prohibited Purpose: Soldier Bonus Bonds.** The Act of 1921 authorizing the State to contract an indebtedness of fifteen million dollars to be used for the payment of a bonus for residents of Missouri who served in the military or naval forces of the United States during the war between the United States and the German Empire, adopted in pursuance to the amendment of 1920 to Section 44 of Article 4 of the Constitution, did not authorize an indebtedness in excess of the limits prescribed or for a purpose prohibited by the Constitution as thus previously amended.

5. ———: **Direction to Legislature: The Word Shall.** A sentence in a constitutional amendment, reading, "The Legislature shall enact such laws as may be necessary to carry into effect this amendment," is an emphatic expression that the framers of the amendment desired such action, but the use of the word "shall" cannot compel the Legislature to act. It is to be construed as making it plain that the amendment required a legislative act to put the amendment into force.

6. ———: ———: ———: **Emergency Clause: Referendum: Exception.** Although an amendment to the Constitution declared that "the Legislature shall enact such laws as may be necessary to carry into effect this amendment," and although an act of the Legislature enacted in pursuance of said amendment contains an emergency clause stating that it "shall be in full force and effect immediately upon being signed and approved by the Governor," said act, if it does not fall within the excepted class of laws that cannot be referred, is subject to referendum to the people, and cannot go into effect for ninety days after the adjournment of the session of the Legislature at which it was enacted, and the state officers charged with its execution cannot proceed under it until said ninety days have expired without a reference.

*Held*, by HIGBEE, J., dissenting, that the clause in the adopted constitutional amendment declaring that "the Legislature shall enact such laws as may be necessary to carry into

effect this amendment" contemplated final action by the Legislature, and an act in harmony with this specially delegated power is not subject to referendum, but is thereby taken out of the class of general legislation.

7. ———: ———: ———: ———: **Soldier Bonus.** An act authorizing the State to issue bonds to be used in paying a bonus to honorably discharged soldiers who served in a past war is not a law "necessary for the immediate preservation of the public peace, health or safety," or a law "making appropriations for the current expenses of the state government" or "for the maintenance of the state institutions" or "for the support of the public schools," and is therefore subject to referendum, and being subject to referendum cannot go into effect for ninety days after the adjournment of the Legislature enacting it; and being subject to referendum the Legislature is without power to attach an emergency clause putting it into immediate effect; and even if said act declares it is "necessary for the immediate preservation of the public peace, health or safety" or necessary for any other purpose, that does not make it such, or prevent its reference.

*Held*, by DAVID E. BLAIR, J., concurring in the result, that the reference in the majority opinion to the ineffectiveness of the use of the public peace, health and safety clause of the Constitution, is gratuitous and unnecessary, because the General Assembly did not use that clause in the act, or attempt by its use to exempt the act from the operation of the referendum.

8. **ACT SUBJECT TO REFERENDUM: General Demurrer.** In a suit in equity to enjoin state officers from issuing bonds under an act valid in every respect, but not in force at the time the suit is tried, because still subject to referendum, a general demurrer perpetually enjoining the issuance of the bonds should not be sustained, but should be sustained on the sole ground that the act is not in effect as a law, only to the extent of restraining action thereunder until such act becomes effective.

Appeal from Cole Circuit Court.—*Hon. J. G. Slate,* Judge.

REVERSED AND REMANDED. (*with directions*).

*Jesse W. Barrett,* Attorney-General, *Henry Davis,* Assistant Attorney-General, and *Stratton Shartel,* Special Assistant Attorney-General, for appellant,

291 Mo.—23

(1)   The amendment submitted and voted on at the general election in November, 1920, was constitutionally submitted and ratified.   The initiative petitions were sufficient in form and number of qualified signers in eleven congressional districts, and a copy of the proposed amendment was published as required by Article XV of the Constitution.   State ex rel. v. Winnett, 10 L. R. A. (N. S.) 149; Pearce v. People. 53 Colo. 399; Green v. Weller. 32 Miss. 650; West v. State, 50 Fla. 154; Worman v. Hogan, 78 Md. 152, 21 L. R. A. 716; Oakland Pav. Co. v. Tompkins, 72 Cal. 5; Taylor v. Commonwealth, 101 Va. 829; Constitutional Prohibitory Amendment, 24 Kan. 700: Hammond v. Clark. 136 Ga. 313.   (2)  Senate Joint and Concurrent Resolution No. 9, adopted by the second extraordinary session of the Fifty-first General Assembly, proposing an amendment to Sec. 44 of Art. IV of the Constitution, and ratified by the voters August 2, 1921, was duly adopted. Sec. 14, Art. 5, Mo. Constitution; Edwards v. Lesueur, 132 Mo. 410, 429. (3) The proclamation of the Governor convening in second extraordinary session the Fifty-first General Assembly recommending the enactment of legislation authorizing the issuance of not exceeding $15,000,000 of bonds of the State, for the payment of bonuses to soldiers and sailors, was ample authority for the passage by said General Assembly of the act approved November 11, 1921.   State v. Rawlins, 232 Mo. 544; Ex parte Fleming v. Wenglen, 269 Mo. 366.   (4) The act in question does not offend against Sec. 28, Art. IV, of the Constitution, either in the matter of more than one subject embraced therein, or in the matter of the title to the act clearly expressing therein the subject thereof. Coffey v. Carthage, 200 Mo. 616; Nally v. Home Ins. Co., 250 Mo. 452; State ex rel. v. Gordon, 261 Mo. 631; Booth v. Scott, 205 S. W. 633; State ex rel. v. Gordon, 268 Mo. 735.   (5)  The act is now in full force and effect.   Secs. 36, 44b, Art. IV, Mo. Const.; State ex rel. v. Becker, 233 S. W. 641; State ex rel. v. Sullivan, 244 S. W. 327.

*Charles & Rutherford* for respondent.

(1) The plaintiff has legal capacity to institute and maintain this suit. Verdin v. City of St. Louis, 131 Mo. 27, 74; Steinbrenner v. City of St. Joseph, 226 S. W. 890. (2) Publication of a proposed amendment must be made within the time and in the manner prescribed. 2 Corpus Juris, p. 693; Pearce v. People, 53 Colo, 399; In re House Res. No. 10, 50 Colo. 71; Hammond v. Clark, 136 Ga. 313, 38 L. R. A. (N. S.) 77; McCreary v. Speer, 156 Ky. 783; Russell v. Croy, 164 Mo. 69; State v. Tooker, 15 Mont. 8, 25 L. R. A. 560; State v. Davis, 20 Nev. 220; Hildreth v. Taylor, 117 Ark. 465; State v. Alderson, 49 Mont. 387, Ann. Cas. 1916B. 39; Cudihee v. Phelps, 76 Wash. 314. (3) The alleged amendment to Article XV of the Constitution was not constitutionally submitted to nor ratified by the electors at the general election held November 2, 1920, because the proposed amendment was not published in a newspaper in Pettis County for four consecutive weeks next preceding November 2, 1920; but was published in said county for three weeks only next preceding said day. Russell v. Croy, 164 Mo. 89; State v. Jones, 168 Mo. 401; Gabbert v. Ry. Co., 171 Mo. 84, 97; Durfee v. Harper, 22 Mont. 354; Koehler v. Hill, 60 Iowa, 543; McMillen v. Blattner, 67 Iowa, 287; Bailey v. Brookhart, 113 Iowa, 250; McCreary, Governor, v. Speer, 156 Ky. 783; State ex rel. v. Tooker, 25 L. R. A. (Mont.) 561; Hunt v. State, 22 Tex. App. 397; Collier v. Frierson, 24 Ala. 109; Mo. Const., Article XV. (4) The proposed amendment to the Constitution authorizing the issuance of $15,000,000 Soldier Bonus Bonds, is invalid for that it was submitted to the electorate at a special instead of a general election. Sec. 2, Art. XV, Mo. Const. (5) This act under consideration is void because it attempts to authorize the contracting of an indebtedness in excess of the limitations prescribed by the Constitution and for a purpose prohibited thereby. Sec. 44, Art. IV, Mo. Const. (6) This act in question is violative of Section 28, Ar-

ticle IV. of the Constitution for that the subject thereof is not clearly expressed in the title. State ex rel. v. Gordon, 268 Mo. 730; State ex rel. v. Gordon, 261 Mo. 640; State v. Horton, 255 Mo. 180. (7) This act in question contravenes Section 28, Article IV, of the Constitution in that Section 12 thereof declares certain acts to constitute a misdemeanor, thus making two different, separate and unrelated subjects. Gabbert v. Ry. Co., 171, Mo. 105. (8) And in that it provides for the issuance of bonds and also for the administration of the distribution of bonuses to soldiers and sailors. (9) Should the court be of the opinion that both of the proposed amendments have been constitutionally submitted and ratified, and that the act in question, approved November 11, 1921, was validly enacted, nevertheless the resolution adopted by the Board of Fund Commissioners on November 22, 1921, authorizing the issuance of $15,000,000 of bonds, is void and of no effect, and any bonds issued in pursuance thereof will be void, for that the said act was not then a law and will not become a law until February 16, 1922, and then only if sufficient referendum petitions have not been filed before that date to refer it. State ex rel. v. Becker, 233 S. W. 641; State ex rel. v. Sullivan, 224 S. W. 327.

WOODSON, J.—This is a bill in equity instituted in the Circuit Court of Cole County by the plaintiff against the defendant to enjoin him from issuing and selling the $15,000,000 worth of bonds of the State of Missouri, to be known and designated as "STATE OF MISSOURI WORLD WAR SOLDIER BONUS BONDS," authorized by Section 44b of Article IV of the Constitution, as adopted in the year 1921, and an Act of the Legislature of Missouri approved November 11, 1921.

A demurrer was filed to the bill in the circuit court, which was by the court overruled, and the defendant declining to plead further a decree enjoining him from issuing the bonds was duly rendered and he duly appealed the cause to this court.

Counsel for the respondent says in his brief that the facts of the case are fully, truthfully and completely stated by counsel for the appellant in their statement of the case; consequently we shall adopt that statement as the statement of the court, which is as follows:

"By her suit in equity instituted in the Circuit Court of Cole County, Missouri, plaintiff, Margaret Fahey, a resident of the city of St. Louis, Missouri, and a taxpayer in said city and the owner of real estate in and situated therein, assessed and legally assessable for state and county taxes, suing for herself and all others similarly situated who might desire to become parties plaintiff, seeks to restrain the defendant, George F. Hackmann, in his official capacity as State Auditor of the State of Missouri, from providing and lodging with the State Treasurer, ready for execution, certain state bonds, alleged to have been authorized by an act of the second extraordinary session of the Fifty-first General Assembly of the State of Missouri, approved November 11, 1921, and also seeks to restrain said defendant from registering the said bonds as therein provided, and from certifying to the several county clerks a rate of taxation to be levied upon the taxable property in their respective counties to pay the principal and interest of said bonds when due.

"Defendant demurred to plaintiff's bill on the grounds, that (a) plaintiff was without legal capacity to sue; (b) that the court was without jurisdiction to hear and determine the alleged cause of action; (c) that the bill did not state facts sufficient to constitute a cause of action, and (d) did not state facts warranting injunctive relief. The demurrer was overruled by the trial court, and defendant declining to plead further, judgment was rendered against him. Whereupon he prayed and was granted an appeal to the Supreme Court of Missouri. The demurrer interposed admits all the well pleaded facts set out in plaintiff's bill, of most of which the court will take judicial knowledge. From the bill the following facts are gathered:

"On July 2, 1920, more than four months before the second day of November, 1920, that day being the day appointed by law for holding a general election in the State, there was filed in the office of the Secretary of State initiative petitions in the form and verified as provided by Section 57, Article IV, of the Constitution, and Chapter 47, Revised Statutes 1919. To each of these petitions there was attached a true printed copy of the proposed amendment to the Constitution repealing Article XV thereof and adopting a new article in lieu thereof. These several petitions were signed by more than five per centum of the legal voters of each of eleven Congressional districts in the State based upon the total vote cast therein for justice of the Supreme Court at the last preceding general election. At the time of filing the said initiative petitions the Secretary of State, in the presence of the then Governor and the person offering the said petitions, detached the sheets containing the signatures and affidavits to said petitions and caused them all to be attached to one or more of the printed copies of the proposed amendment, and delivered the detached copies to the person offering them for filing.

"For the purpose of this suit the only change in Article XV made by the proposed amendment that need be here noticed was that proposed amendments either by the General Assembly or initiative petition 'shall be submitted to the electors of the State for their approval or rejection, by official ballot title as may be provided by law . . . at the next general election, or at a special election called for the Governor in his discretion prior to such general election, at which he may submit any one or more of such proposed amendments.' The Secretary of State determined on an investigation that the said petitions were sufficient in form, and signed by a proper number of voters in eleven Congressional districts. Thereafter, and within the time prescribed by law, the Secretary of State transmitted to the Attorney-General a copy of said proposed amendment, and within ten days thereafter the Attorney-General provided and returned to the Secretary of State an official ballot title, as follows:

## " 'PROPOSED BY INITIATIVE PETITION CONSTITUTIONAL AMENDMENT.'

" 'Proposed amendment repealing Article XV, Missouri Constitution, enacting a new article in lieu thereof, providing mode of revising and amending Constitution and for calling Constitutional Convention.'

"The Secretary of State, thereafter, at the time he was required by law so to do, certified the proposed amendment for publication prior to the general election to be held on November 2, 1920, and the same, as proposed, was published in a newspaper in each county in the State for four consecutive weeks next preceding November 2, 1920, save in Pettis County, when it was only published by the three weeks next preceding the election, to-wit, on October 15th, 17th, 22nd, 29th, and 31st. At the time provided by law for the Secretary of State to furnish to the several county clerks the names of the candidates for state and county offices, he furnished to each of said clerks a certified copy of the official ballot title and number of said proposed amendment, and the same were printed upon the ballots for said election, and a proper number thereof at a proper time furnished to the electors in each and every voting precinct in the State. Within thirty days after the election held on November 2, 1920, the Secretary of State received from the several county clerks abstracts of the returns of said election, and did, in the presence of the Governor, canvass the votes cast for and against the ratification of said proposed amendment, and as a result of said canvass it was ascertained that there had been cast for and against the ratification thereof a total of 712, 352 votes, of which number 394,437 were cast for the ratification of the said proposed amendment, and 317,815 votes were cast against its ratification. At said election there were cast in the State for President a total of 1,332,800 votes, of which number there were cast in Pettis County a total of 15,355 votes. For and against the ratification of said proposed

amendment there were cast at said election in Pettis County 9,869 votes, of which number there were cast for the ratification thereof 6,003 votes, and 3,856 votes were cast against it.

"On November 29, 1920, the then Governor of the State issued his proclamation, as provided by Section 6754,. Revised Statutes 1909, declaring the said proposed amendment in full force and effect and a part of the Constitution of the State from and after the date last aforesaid. At twelve o'clock noon, on Wednesday the 5th day of January, 1921, the Fifty-first General Assembly of the State convened in regular biennial session, in the Capitol in the city of Jefferson City in Cole County, and remained in continuous session until twelve o'clock noon on March 21, 1921, at which time it adjourned *sine die.*

"On the ―― day of January, 1921, the House of Representatives adopted rules for its government and procedure, among which was Rule No. 87, requiring all joint and concurrent resolutions designed to submit to the electorate of the State for ratification or rejection proposed amendments to the Constitution of the State, to be read on three separate days and reported upon by a committee, and otherwise proceeded upon in like manner as a bill. By Rule No. 89, adopted by said House, a standing rule might be dispensed with, with the concurrence of a majority of the members present,

"On January ――, 1921, the Senate adopted rules for its government and procedure, among which were rules numbered 65 and 66. By Rule No. 65 it was required that all resolutions proposing amendments to the Constitution should be treated in all respects, in the introduction and form of proceedings on them, in a similar manner to bills; and by Rule No. 66 a standing rule of the Senate might be suspended, by a majority vote of the Senators-elect or by a vote of two-thirds of the Senators present. On March 14, 1921, there was introduced into the Senate by Senator Howard Gray, Senate Joint and Concurrent Resolution No. 9, which was then and there read the first

time. Thereafter, on the day aforesaid, on motion made, seconded and carried, the rules of the Senate were suspended and the resolution read a third time and placed upon its passage. All of the Senators present, they being more than a majority of the Senators-elect, voted for its adoption and their names and how they voted were entered upon the Senate Journal. Thereupon, on the day last named the title to the resolution was agreed to by the Senate and a second motion to reconsider the vote by which the resolution was adopted was laid on the table. On March 15, 1921, the Senate transmitted to the House of Representatives and that body received the said resolution, and thereupon it was read the first time. On March 16, 1921, on motion made, seconded and carried, the rules of the House were suspended and the said resolution read a third time and placed upon its final passage, when and where all of the members of the House present, they being more than a majority of the members-elect, voted for the adoption thereof, and their names and how they voted were entered upon the Journal of the House. Whereupon the title to the said resolution was agreed to by the House and a motion to reconsider the vote by which it was adopted was laid upon the table. On the day last aforesaid the said resolution was by the House reported back to the Senate as having been adopted by the House. Thereupon the said resolution, as adopted by the said General Assembly, was duly enrolled and reported to the Senate by the Senate Committee on Enrolled Bills as having been 'truly enrolled.' Thereupon, on the day last aforesaid, all other business of the Senate was suspended, and in open session the said resolution was read at length, and, there being no objection, it was signed by the President and the Secretary of the Senate and transmitted to and received by the House, when and where, all other business being suspended, in open session of the House the resolution was read at length, and there being no objection, it was signed by the Speaker of the House and its Chief Clerk. It was then transmitted to the Governor and by him approved and signed on March

25, 1921, and by the Secretary of State published in the 1921 Session Laws of said General Assembly, at page 695.

"Thereafter, to-wit, on the —— day of March, 1921, the Secretary of State transmitted a copy of said resolution to the Attorney-General, who did, on the —— day of March, 1921 provide and return to the Secretary of State an official ballot title for said proposed constitutional amendment, as follows:

" 'Proposed Constitutional Amendment authorizing the Legislature to incur and provide by taxation for the payment of indebtedness not exceeding fifteen million dollars for bonuses to soldiers and sailors.'

"Thereafter, on the —— day of March, 1921, the Secretary of State served upon Senator Howard Gray, a Senator in said General Assembly and the author of said resolution, a copy of said official ballot title. On June 20, 1921, the Governor issued his proclamation calling a special election to be held throughout the State on August 2, 1921, submitting to the electors of the State for adoption or rejection the last aforesaid proposed amendment. Thereafter, on July 11, 1921, the Secretary of State certified to the several county clerks and boards of election commissioners the said official ballot title for said proposed amendment, and the same was printed on the official constitutional ballot, and a proper number of ballots at a proper time was furnished to the voters in 'each and every voting precinct. Prior to August 2, 1921, the Secretary of State caused a copy of said proposed amendment to be published in a newspaper in each county in the State and in the city of St. Louis, once a week in each of the four consecutive weeks next preceding said last named date. The said special election was held throughout the State on the day appointed and an abstract of the returns thereof made to the Secretary of State, who, in the presence of the Governor, on August 12, 1921, canvassed the same, and as a result of such canvass it was ascertained that there had been cast for the ratification of said proposed amendment 210,238 votes

and against the ratification thereof there had been cast 100,131 votes. On August 17, 1921, the Governor issued his proclamation declaring said proposed amendment duly ratified and a part of the Constitution of the State.

"On October 24, 1921, Arthur M. Hyde, Governor of the State, issued his proclamation convening in a second extraordinary session the Fifty-first General Assembly of the State. This proclamation covered the subject of soldiers' bonus bonds, and was in due form and issued in due time.

"In compliance with said proclamation the Fifty-first General Assembly convened in extraordinary session at the place and time appointed, and remained in continuous session until twelve o'clock noon on the —— day of November, 1921, when it adjourned *sine die.* On the first day of said session there was introduced into the Senate, and read, the first time, Senate Bill No. 1

"On November 4, 1921, the bill was read a second time and referred to the Committee on Ways and Means, which committee on November 5, 1921, reported it back to the Senate with recommendation that 'it do pass' with amendments. On November 7, 1921, the bill was taken up for engrossment, amended and ordered engrossed and printed. Thereafter it was engrossed and printed and on November 8, 1921, reported back to the Senate by the Committee on Engrossed Bills as 'truly engrossed and correctly printed.'

"On November 8, 1921, on motion, seconded and carried, the rules of the Senate were suspended and the bill read a third time and placed upon its final passage. All of the Senators present, they being more than a majority of the Senators-elect, voted for it and their names and how they voted were entered upon the Senate Journal. On the day last aforesaid a vote was taken in the Senate on the emergency declared to exist by Section 26, and all of the Senators present, they being more than two-thirds of the Senators-elect, voted therefor, and their names and how they voted was entered on the Senate Journal. Thereupon the title to the bill was agreed to by

the Senate, and a motion to reconsider the vote by which the bill passed was laid on the table. On November 8, 1921, the bill as passed by the Senate was transmitted to and received by the House of Representatives and read the first time. On November 9, 1921, it was read the second time and referred to the Committee on Ways and Means. On November 10, 1921, said committee reported it back to the House with recommendation that 'it do pass.' Thereupon, on the day last aforesaid, the bill was read a third time and placed upon its final passage. All of the members of the House, save one, they being more than a majority of all the members-elect, voted for the passage of the bill, and their names and how they voted were entered upon the Journal of the House. Thereupon the title to the bill was agreed to. The emergency declared to exist by Section 26 was assented to by more than two-thirds of the members of the House, and their names and how they voted entered upon the House Journal. On the same day the bill was reported back to the Senate as having passed the House, and on November 11, 1921, the Senate Committee on Enrolled Bills reported it back to the Senate as having been 'truly enrolled.' . Thereupon all other business was suspended in the Senate, and the bill was read at length, and there being no objection it was signed by the President and Secretary of the Senate. It was then transmitted to and received by the House, whereupon on the day last aforesaid all other business of the House was suspended, and it was read at length, and there being no objection it was signed by the Speaker and Chief Clerk of the House of Representatives, and as passed and signed it was immediately presented to and approved and signed by the Governor.

"On November 22, 1921, the Board of Fund Commissioners at a meeting held in the executive offices adopted a resolution authorizing the issuance and sale of $15,-000,000 of the bonds of the State, and prescribing the form of the bonds and interest coupons, the date and rate of interest they should bear, and the place where the

principal and interest should be paid and when they should mature, and the denominations in which they should be issued, and directing defendant to provide them ready for execution with all convenient speed, and when executed to register them as in said act provided.

"It is alleged in plaintiff's bill that defendant is negotiating with printing concerns for printing the bonds and will provide them ready for execution and lodge them with the State Treasurer, and is threatening and declaring his purpose and intention to register them when executed, as in said act and resolution he is directed to do."

The foregoing is a statement of the facts as averred in plaintiff's bill and admitted by defendant's demurrer to be true.

The reasons stated in the bill for the injunctive relief which plaintiff prays are:

"1.　Plaintiff further states that the amendment proposed to Article 15 of the Constitution of Missouri, submitted to the electorate for ratification at the general election of November 2, 1920, was not constitutionally submitted to or ratified by the electorate, and is therefore void and of no effect, for that a copy of the said proposed amendment was not published in Pettis County, it being one of the counties of the State, and in which several newspapers were and are printed and published, for four consecutive weeks next preceding the said general election; but plaintiff avers that the publication made, and the only publication made in said Pettis County, was made in the 'Sedalia Democrat,' in said county, and was printed and published in the issues of that paper of October 15, 17, 22, 29, and 31, 1920, as hereinbefore alleged, said publications being in three consecutive weeks only next preceding said general election.

"2.　That the amendment to Section 44 of Article 4 of the Constitution of Missouri, which was proposed by the Fifty-first General Assembly of Missouri, by its said Senate Joint and Concurrent Resolution No. 9, and which is now designated as Section 44b of said Article 4, was not constitutionally ratified by the electorate of said

State, and was and is therefore void and of no effect, for that it was submitted to and voted upon by the electorate of the State of Missouri at a special election instead of at a general election, as required by Article 15 of the Constitution.

"3. That the said amendment to Section 44 of Article 4 of the Constitution of Missouri, which was submitted to and voted on by the electorate of the State of Missouri at the said special election, held on August 2, 1921, and which was proposed by said Senate Joint and Concurrent Resolution No. 9, and which is now designated as Section 44b of said Article 4, was not constitutionally ratified, and was and is therefore void and of no effect, for that there then existed no statute of the State of Missouri prescribing the method and machinery for the calling and holding of such a special election.

"4. That the proclamation of the Governor of Missouri, issued and promulgated on the 24th day of October, 1921, convening in a second extraordinary session the Fifty-first General Assembly, was insufficient to authorize the said General Assembly to consider and enact the aforesaid act of the General Assembly, attempting to carry into effect the said amendment to the Constitution, attempted to be ratified by the electorate on the said 2nd day of August, 1921.

"5. That the alleged act of the second extraordinary session of the Fifty-first General Assembly of Missouri, attempting to carry into effect the aforesaid amendment to the Constitution, alleged to have been ratified on the 2nd day of August, 1921, was and is violative of Section 28 of Article 4 of the Constitution of Missouri, for that it contains more than one subject, to-wit, three subjects, viz.:

"(a) The payment of bonuses to certain soldiers and sailors of the State of Missouri, in the late war between the United States and the German Empire and its allies.

"(b). That it also provides for the issuance and sale of fifteen million dollars of bonds of the State of

Missouri, with which to provide the funds with which to pay such bonuses, a separate and distinct subject from that of payment of said bonuses.

"(c) That the said act defines, creates, and makes it a misdemeanor for anyone knowingly to make a false statement, oral or written, of a material fact relating to a claim under the provisions of the said act.

"6. That the said act is also violative of Section 28 of Article 4 of the Constitution in that the title to said act does not clearly state the subject of the act as therein embracing, creating and defining a misdemeanor, but on the contrary designates the aforesaid misdemeanor as a penalty only.

"7. Plaintiff further states that if the proposed amendments to the Constitution hereinbefore mentioned, and set out, have been constitutionally submitted to and ratified by the electorate of the State, and if the second extraordinary session of the Fifty-first General Assembly was constitutionally convened and the aforesaid act of said extra session was constitutionally and legally enacted, and signed and approved by the Governor, the same is not yet effective and in force because the said act is subject to a referendum to the people of the State, as authorized by Section 57 of Article 4 of the Constitution of the State, and Chapter 47 of the Revised Statutes of Missouri of 1919, and being a referable act within the meaning of the Constitution and statute aforesaid, the action of the Board of Fund Commissioners in adopting the resolution providing for, authorizing and directing the issuance and sale of fifteen million dollars of the bonds of the State, to be known and designated as 'STATE OF MISSOURI WORLD WAR SOLDIER BONUS BONDS' and directing the defendant, as State Auditor, to provide, ready for execution, the bonds in said resolution hereinbefore mentioned and described, and lodge them with the State Treasurer, was and is premature, and therefore void and of no effect: That the said defendant is not authorized to take any action whatever in and about providing the said bonds, or any of

them, or to register the said bonds, or any of them, as in said resolution and act provided and attempted to be authorized.

"Plaintiff further states that the proposed bonds herein described can have no validity unless registered by defendant State Auditor, when all the conditions of the law may have been complied with in the issuance thereof, and after the evidence thereof may be on file in his office. That there is no law of the State authorizing the issuance of said bonds, or the registration thereof, and if said bonds are permitted to be issued and sold, they will be void of no effect, and the purchasers thereof defrauded of the money paid for them and the good name and credit of the State seriously injured and impaired.

"8. That the said act passed by the second extraordinary session of the said Fifty-first General Assembly approved November 11, 1921, is violative of Section 44 of Article 4 of the Constitution of Missouri for that it authorizes the incurring and contracting of indebtedness on behalf of the State in excess of the limitations prescribed by said section, and for a purpose prohibited therein.

"9. Plaintiff further avers that defendant State Auditor is now threatening to provide the said bonds and lodge them with the State Treasurer as in said void act he is directed to do, and will provide the said bonds as in said act directed, unless restrained by this honorable court.

"10. Plaintiff further says that it is provided in the alleged amendment to Section 44 of Article 4 of the Constitution, and in the said act of the said second extra session of the said General Assembly, that defendant State Auditor shall, after the issuance of said bonds, annually on or before the first day of July, determine the rate of taxation necessary to raise the amount of money needed for that year to pay the principal and interest maturing in the next succeeding year, and annually certify such rate of taxation so determined to

the clerk of the county court of each county, and to the assessor or other officer of the city of St. Louis, whose duty it may be to make up and certify the tax books wherein are extended the state taxes, and when so certified by said State Auditor it is provided by the said act that it will be the duty of said clerks and the assessor or other proper officer of the city of St. Louis to extend upon the tax books the taxes to be collected and certify the same to the collector of the revenue of their respective counties and the city of St. Louis, who shall collect such taxes at the same time and in the same manner and by the same means as are now or may hereafter be provided by law for the collection of state and county taxes, and pay the same into the State Treasury, to the credit of the 'Missouri Soldiers' Bonus Bonds Interest and Sinking Fund,' attempted to be created by said act.

"That defendant State Auditor is threatening to and has declared his intention and purpose, when the said bonds shall have been issued, to determine and certify, as in said act directed, annually, on or before the first day of July, the rate of taxation necessary to raise the amount of money needed for that year to pay the principal and interest of said bonds maturing in the next succeeding year, and when so certified such tax will be extended on the tax books in the several counties of the State and the city of St. Louis and thereby cast a cloud upon the title to taxable real estate owned by plaintiff in the State of Missouri, to her injury and damage.

"That the said taxes when certified and extended as in said act provided will be void, for that the debt attempted to be incurred by the issuance of said bonds will be void, but the taxes levied upon plaintiff's real property to pay the said bonds will create and constitute a cloud upon her title to said property, to her irreparable injury and damage, and likewise upon the title to the real estate owned by all other persons in the State, and to their irreparable injury and damage."

I.   This court has repeatedly held that the plaintiff in this class of cases has the legal capacity to maintain

291 Mo.—24

this kind of a suit. [Verdin v. City of St. Louis, 131 Mo. 27, l. c. 74; Steinbrenner v. City of St. Joseph, 226 S. W. 890.]

II. Counsel for plaintiff next contends that the amendment to Article XV of the Constitution **Sufficient** of Missouri in the year 1920 was not consti- **Publication.** tutionally submitted to nor ratified by the voters of the State at the general election held November 2, 1920, because the proposed amendment was not published in a newspaper in Pettis County for four consecutive weeks preceding November 2, 1920, but was published in said county for three weeks, only, preceding said day.

An investigation of the record shows that the Secretary of State in proper time furnished to one or more newspaper of each and all of the counties of the State a certified copy of the proposed amendment to the Constitution for publication as required by Section 1 of Article 15 of the Constitution, but for some reason not disclosed by this record the paper designated for that purpose in Pettis County only published the proposed amendment for three weeks instead of four, as the Constitution required.

Because of this omission of the publication of the proposed amendment for one week in Pettis County, it is insisted by counsel for plaintiff that the entire publication in all of the counties of the State is void and of no force and effect, and therefore the amendment was not legally adopted, and consequently is void and of no force or effect.

In support of this insistence we are cited to the following authorities: 2 Corpus Juris, 693; Pearce v. People, 53 Colo. 399; In re House Resolution No. 10, 50 Colo. 71; Hammond v. Clark, 136 Ga. 313, 38 L. R. A. (N. S.) 77; McCreary v. Speer, 156 Ky. 783; Russell v. Croy, 164 Mo. 69; State ex rel. v. Tooker, 15 Mont. 8, 25 L. R. A. 560; State ex rel. v. Davis, 20 Nev. 220; Hildreth v. Taylor, 117 Ark. 465; State ex rel. Hay v. Alderson, 49

Mont. 387, Ann. Cas. 1916B, 39; Cudihee v. Phelps, 76 Wash. 314.

I am unable to see what the case of Pearce v. People, 53 Colo. 399, has to do with the case at bar. It first holds that an amendment to the Constitution may be proposed at a special session of the Legislature of that State; second, that the law of that State did not require the publication of the proposed amendment should appear in the Session Acts for any particular time before the election; and, third, that the publication for "four successive weeks" prescribed by the Constitution of that State relates to the publication required to be made in the newspapers, and not to that in the Session Laws.

Nor do I see how the case of In re House Resolution No. 10, 50 Colo. 71, has any bearing upon the case in hand, in so far as the point under consideration is concerned. That case simply holds that Section 2 of Article XIX of the Constitution providing that every proposed amendment to the Constitution must be published in one newspaper of general circulation in each county was not complied with by a publication made in a newspaper devoted to a particular branch of industry.

I am unable to see how counsel for plaintiff can reap any consolation from the case of Hammond v. Clark, 136 Ga. 313. There an amendment to the Constitution had been proposed by the Legislature in the manner provided by that instrument, and it had been submitted to the voters for ratification at the prescribed time, and in substantially the prescribed manner, and had been ratified by them, and it was held that the amendment would not be declared void, even if it should appear that an executive or ministerial officer did not comply strictly with the law as to the extent of publication in a particular newspaper.

Nor has the case of McCreary v. Speer, 156 Ky. 783, any bearing upon this case. There the Constitution required that the proposed amendment should be published ninety days in certain newspapers prior to the date of the election, and the publication was only had for sixty

days, and the Supreme Court held that such publication was insufficient and that the amendment was not legally adopted.

Likewise of the case of Russell v. Croy, 164 Mo. 69. In that case, the Constitution required that a proposed constitutional amendment should be published "weekly in some newspaper, if such there be, in each county in the State, for four consecutive weeks next preceding the general election." In that case the court only held that the particular four weeks designated in the Constitution were those regular calender periods of seven days each, beginning on Sunday and occurring next before the Tuesday of election day, and that a publication in every county once a week in each of those four weeks is what the Constitution requires, and not that the first publication must be in each county twenty-eight days preceding the election.

Nor does the case of State v. Tooker, 15 Mont. 8, assist counsel for plaintiff. There the constitutional provision regarding amendments thereto required that the proposed amendment should be published three months before election. The Supreme Court of Montana in that case held that the constitutional requirement regarding the publication was not complied with and therefore the amendment was not legally adopted; and the court in reaching that conclusion laid great stress upon the fact that the constitutional requirement was mandatory in express terms, that it was "also mandatory by virtue of Section 29 of Article III declaring that the provisions of this constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise."

In the case of State v. Davis, 20 Nev. 220, the constitution and statutes of the State required ninety days publication of the proposed amendment, but in fact no publication whatever was made. In that case the court held that amendment was not legally adopted.

I have very carefully read the case of Hildreth v. Taylor, 117 Ark. 465, which is very long and rather com-

plicated, and at the same time has nothing earthly to do with the case in hand beyond holding that such constitutional provisions and statutory enactments should receive a liberal construction. Therefore in my opinion it is not worth the time and space to insert herein a digest of the case in this opinion.

Nor has the case of State ex rel. Hay v. Alderson, 49 Mont. 387, any bearing upon this case; there the constitution required the amendment to be published for three months prior to the date of the election, and the court held that a publication in a weekly, or once a week in a daily or semi-weekly paper, was a compliance with the constitutional mandate regarding the publication.

The case of Cudihee v. Phelps, 76 Wash. 314, was a case where the constitution of the State required three months' publication of the proposed amendment to the constitution, but the statute of the State enacted for the purpose of carrying into effect the constitutional provision required only three weeks, instead of three months, as required by the constitution. The Secretary of State obeyed the constitutional mandate, instead of the statutory enactment, and the Supreme Court of Washington held that the Secretary of State had substantially complied with the law, and that the amendment was legally adopted.

In the case of State ex rel. v. Tooker, 25 L. R. A. 560, the constitution required that at least three months' publication of the proposed constitutional amendments should be made in certain newspapers, prior to the next ensuing election, while in fact only two weeks' publication was made, and the Supreme Court of Montana held under those facts that the amendment was not legally adopted.

In the case of Collier v. Frierson, 24 Ala. 100, the third paragraph of the syllabus substantially states the ruling of the court: "The General Assembly of 1844-5 having proposed several amendments of the Constitution, joint resolutions were adopted at the next succeeding session, reciting in the preamble that, 'whereas the

General Assembly of this State, at the last session of the same, duly submitted to the people of said State proposed amendments to the Constitution; and whereas the people of this State, in manner and form as provided by the Constitution, have accepted the said amendments, which are in words and figures following,' etc., setting them all out except one, which was entirely omitted; and the usual clause was then added, enacting 'that the aforesaid amendments to the Constitution, proposed as aforesaid, and accepted by the people as aforesaid, be ratified, and that the same, from and after the passage of this resolution, be and form a part of the Constitution of the State of Alabama:' *Held,* that the amendment which was entirely omitted from the ratifying resolutions, was not constitutionally ratified, and therefore failed.''

Having analyzed the authorities cited by counsel for the plaintiff, and having found that none of them have but little if any bearing upon the case at bar, we shall now consider the authorities cited by counsel for defendant. But before doing so, it may be well to relate briefly the position of defendant, which is the converse of the position taken by counsel for the plaintiff, and is as follows:

''The amendment submitted and voted on at the general election in November, 1920, was constitutionally submitted and ratified. The initiative petitions were sufficient in form and number of qualified signers in eleven congressional districts, and a copy of the proposed amendment was published as required by Article XV of the Constitution.''

In support of 'that contention we are cited to the following authorities: State ex rel. v. Winnett, 10 L. R. A. (N. S.) 149; Pearce v. People, 53 Colo. 399; Green v. Weller, 32 Miss. 650; West v. State, 50 Fla. 154; Worman v. Hagan, 78 Md. 152, 21 L. R. A. 716; Oakland Pav. Co. v. Tompkins, 72 Cal. 5; Taylor v. Commonwealth, 101 Va. 829; Con. Prohibitory Amendment, 24 Kan. 700; Hammond v. Clark, 136 Ga. 313.

In the case first cited State ex rel. v. Winnett, 10 L. R. A. 149, the Constitution of Nebraska required the

publication of all proposed amendments to that instrument for three months next before the general election, at which Senators and Representatives thereafter were to be voted for, in at least one newspaper in each county of the State. Through some inadvertence the publication was made for only three weeks in one of the months, instead of four, in one of the counties of the State, and in that case that able court held that where there was a substantial compliance with the constitutional requirement, the fact that the publication was made for one week less than the required time in one county of the State did not invalidate the amendment.

We have heretofore considered the case of Pearce v. People, 53 Colo. 399, under the head of authorities cited by counsel for plaintiff, and after a re-examination of the same we are still of the opinion that it has but little, if any, bearing upon the case at bar.

I am unable to see in what possible way the case of Green v. Weller, 32 Miss. 650, has to do with the question of the publication of the proposed amendments to the Constitution, except that the Constitution requires that such proposed amendment should be published for six months next before the following general election to be held in that State. The case is very lengthy, but the question of failure to publish the proposed amendment was not mentioned in that case as I read it.

Nor has the case of West v. State, 50 Fla. 154, any special bearing on the case at bar. The question of the publication of the proposed amendment was not involved in the case. Nor was this question presented to or decided by the court in the case of Worman v. Hagan, 78 Md. 152. Nor in the case of Oakland Paving Co. v. Tompkins, 72 Cal. 5, was the question of publication involved.

In the case of Taylor v. Commonwealth, 101 Va. 829, the question of publication of proposed amendments is not mentioned in the case. Nor has the case of Constitutional Prohibitory Amendment, 24 Kan. 700, anything to say regarding the publication of the proposed amendments. It is but fair to counsel to state that while

none of the cases cited by either side, except that of State ex rel. v. Winnett, 10 L. R. A. 149, discusses or decides the constitutional requirement to publish proposed amendments to the constitution, yet many of them do discuss and decide whether or not such proposed amendments should or should not be entered in full in the journals of the House of Representatives and those of the Senate, and whether or not the general provisions of the respective states referred to in the various opinions were directory or mandatory. But as previously stated those rulings have but little bearing upon the specific question as to whether or not the failure to publish the proposed amendment in the Pettis County paper for one week less than that required by the Constitution vitiated the entire publication, and thereby renders the amendment invalid.

This precise question was decided in the case of State ex rel. v. Winnett, supra, where the Supreme Court of Nebraska held that such an omission did not render the amendment invalid, and in my opinion that opinion properly declared the law, and if followed would necessarily lead to the conclusion that the publication in the case at bar was in substantial compliance with the constitutional mandate and that the amendment is valid and is in full force and effect.

But there is another reason why the amendment in question should be upheld and that is that if the entire vote of Pettis County should be eliminated from the entire vote of the State or counted against the proposed amendment, still the amendment would have something like 75,000 majority in its favor, so under no circumstances can it be said that the failure to give the full required publication in that county could have or did effect the final vote as cast throughout the State.

We therefore hold that the amendment of Article XV of the Constitution of 1875 as voted for on November, 1920, was duly adopted by the people of the State, and that it was in full force and effect when the special election of August 2, 1921, was held, authorizing the

issuance and sale of the $15,000,000 Bonus Bonds before mentioned.

III.  It is also insisted by counsel for plaintiff that the proposed amendment of the Constitution authorizing the issuance of the $15,000,000 Soldier

*At Special Election.* Bonus Bonds is invalid for the reason that it was submitted to the electorate at a special, instead of a general, election.  According to the requirements of Article XV of the Constitution of 1875, amendments to the Constitution had to be submitted to the people of the State for adoption or rejection at a general election to be held in the State, but the amendment of that Article adopted at the general election held November 2, 1920, provided that such amendments might be voted on at either a special or general election of the State.  That question was decided in Paragraph II of this opinion, and therefore this insistence is decided against the plaintiff.

IV.  Counsel for plaintiff next contends that the act under consideration is void because it attempts to authorize the contracting of an indebtedness

*Excessive Indebtedness.* in excess of the limitations prescribed by the Constitution and for a purpose prohibited thereby.  Counsel has not favored us with any suggestion showing in what way the act of the Legislature attempts to create an indebtedness in excess of the constitutional limitations, or why the Soldier Bonus Bonds are for a purpose prohibited by the Constitution.  Nor has he cited us to any authority supporting either branch of this contention, nor do we know of any such. We therefore rule this point against the plaintiff.

V.  It is also insisted that the act under consideration, approved November 11, 1921, is violative of Section 28 of Article 4 of the Constitution, for the

*Title.* reason that the subject thereof is not clearly expressed in the title of the act.  Counsel seems to place

little confidence in this insistence for the reason that he has not called our attention to the title of the act, nor pointed out to us the obscurity of the title he has in mind.

We have read the title, and after so doing, we are unable to see an obscurity therein, and by reading the cases of Coffey v. Carthage, 200 Mo. 616; State ex rel. Scott v. Gordon, 261 Mo. 631; Booth v. Scott, 205 S. W. 633; State ex rel. v. Gordon, 268 Mo. 1. c. 735, it will be seen that there is no merit in this insistence and it is therefore decided against the plaintiff.

VI. Having ruled that the two constitutional a-mendments, attacked by the pleadings, were legally adopted as indicated by our rulings above, we reach the only serious question in the case. The suit being one to enjoin the issuance and registry of the bonds, it requires us to note the authority of such issuance. By Section 44b of Article 4 of the Constitution, adopted by a vote of the people in August, 1921, it is provided: "In ad-dition to the exceptions made and created in Sections 44 and 44a, the General Assembly shall have power . . . to contract or to authorize the contracting of a debt or liability on behalf of the State, and to issue bonds or other evidences of indebtedness thereof not exceeding in the aggregate fifteen millions of dollars; such bonds or other evidences of indebtedness to bear interest at a rate not exceeding five per cent per annum, payable semi-annually, and maturing not later than twenty years from the date they bear." [Laws of Missouri, 1921, First Extra Session, pp. 197, 198.]

This is a grant of power to the General Assembly not theretofore possessed by it, under the limitations in the Constitution as it stood before this amendment. The amendment is quite long, but all other provisions therein are self-enforcing. The amendment might have directed the issuance and sale of these bonds through some other agency of the State, and thus made the whole amendment self-enforcing. It might have made the amount of the issue definite, and interest rate definite, and the time of

payment definite, and then authorized the Board of Fund Commissioners to issue, register and sell the bonds, and the State Treasurer to pay to the proper parties. The framers, however, did not do this, but left it to the General Assembly to accomplish the purpose of the amendment by a legislative act. By this amendment, or rather by the portion quoted above, which is found in the first sixteen lines thereof, legislative discretion was left (1) as to the amount of the bonds issued, subject of course to the limitation of fifteen millions, (2) as to the rate of interest, subject to a limitation of five per cent, and (3) the time of payment, subject to the limitation of twenty years. It required a legislative act before these bonds could be issued or sold. But it is urged that the material portions of the amendment are self-enforcing, and that the whole is but a mandate from the framers to the General Assembly to give effect to the amendment. In this connection it will be noted that in the middle of the amendment appears this sentence: ''The Legislature *shall* enact such laws as may be necessary to carry into effect this amendment.''

The Constitution is dotted over with the word ''shall'' as it is used here. Constitution of Missouri as follows: Sec. 41, Art. IV; Sec. 43, Art. IV; Sec. 29, Art. VI; Sec. 34, Art. VI; Sec. 9, Art. VIII; Sec. 7, Art. IX; Sec. 12, Art. IX; Sec. 14, Art. IX; Sec. I, Art. XI; Sec. 3, Art. XI; Sec. 5, Art. XI; Sec. 12, Art. XII;. Sec. 14, Art. XII; Sec. 15, Art. XII; Sec. 7, Art. XIII; Sec. 7. Art. XIV.

It does not and cannot follow that the laws passed in pursuance of these numerous ''shalls'' are not referable laws, under Section 57 of Article IV. It is true that the use of this word emphasizes the fact that the framers of the amendment desired legislative action, but its use cannot compel the Legislature to act. Such Legislature might refuse to act, and the only remedy of the people who framed the amendment would be to (1) elect a different Legislature, or (2) to initiate and adopt the necessary laws. We call attention to this, not to have it in-

ferred that legislatures do not usually follow the suggestion of the Constitution, and enact laws, but to make it plain that the very vital portion of the amendment (contained in the first 16 lines) required a legislative act to put the amendment in force.

In the present instance the General Assembly during the second extra session of that body, in November, 1921, promptly passed what is known as Senate Bill No. I. This bill was duly signed by the Governor on November 11, 1921, and it is under this law that the threatened action of the State Auditor is proposed. This bill, so signed, is composed of 26 sections—many of them of some length. It follows the constitutional amendment, and contains the following emergency clause in Section 26 thereof:

"Sec. 26. The fact that many of the beneficiaries of this act are not employed and in dire need of the partial compensation sought to be provided for them in this act creates an emergency within the meaning of Section 36 of Article IV of the Constitution of the State of Missouri, and this act shall be in full force and effect immediately upon being approved and signed by the Governor."

It is by virtue of this clause that proposed action under the law at this time is threatened. We regret to postpone the disposition of this fund, so richly deserved by the beneficiaries thereof, for even the short space of six or seven weeks, but we feel that the heroes entitled to the fund would not ask us to run counter to former judicial determinations in order to save this short space of time.

This law is an act of the Legislature, and under Section 57 of Article IV of the Constitution is subject to the referendum. Being subject to the referendum it cannot go into effect for ninety days after the adjournment of the Legislature which enacted it. It is not a law which falls within the excepted class created by Section 57 of Article IV. We have ruled that an emergency clause has no place in a law which does not fall within the excepted class as provided in said Section 57, supra. [State ex rel. Westhues v. Sullivan, 283 Mo. l. c. 575 et seq.].

The law involved in this case does not fall within the excepted class of laws provided for by said Section 57. That class includes "laws necessary for the immediate preservation .of the public peace, health or safety and laws making appropriations for the current expenses of the State Government, for the maintenance of the State institutions and for the support of public schools." All other acts of the General Assembly are subject to the referendum, and being subject to the referendum cannot go into effect for ninety days after the adjournment of the Legislature passing them. This Act of Nov. 11, 1921, does not have what is called a "peace, health or safety" clause, and it would be ineffective if it did. [State ex rel. Pollock v. Becker, 289 Mo. 660, 233 S. W. 641.] It only has the emergency clause set out above. As ruled in the Westhues Case, supra, the Legislature is without power to attach an emergency clause to a referable act of the Legislature. With the ruling in the Westhues Case we are fully satisfied. The case law upon the subject will be found in that opinion, and we epitomized the rulings in this language: "The force of the rule is that the Legislature cannot give immediate effect to any measure which is subject to referendum; but may or may not (by an emergency clause) give immediate effect to non-referable laws. When read together these constitutional provisions mean that by no process can the Legislature preclude the referendum upon measures subject to reference by the terms of Section 57, supra. That the term 'any act' as therein used is broad enough to cover the measure before us cannot be questioned."

The Act of November 11, 1921, is valid in every particular, but is not in force at this time. There is no right to proceed under it until the ninety day period has expired. After it becomes effective the bonds issued pursuant to its terms will be valid and binding obligations of the State.

The judgment in the lower court is one upon the overruling of a demurrer to the petition, and wherein the defendant stood upon his demurrer and refused to plead

further. We are not advised upon what ground the trial court based his ruling, but if the law, under which action was threatened, was not in effect, the judgment on the demurrer was proper. By this we mean that the trial court was right in sustaining the demurrer, on the sole ground that the law of November 11, 1921, was not in force.

The judgment entered by the trial court is a general judgment, perpetually enjoining the defendant, Hackmann, from registering and lodging with the State Treasurer any of the bonds provided for by the Act of November 11, 1921. This judgment is too broad. The trial court should have sustained the demurrer upon the sole ground that the Act of November 11, 1921, was not then in effect as a law of the State, and upon no other ground. The restraining order against Hackmann is too broad. It should have restrained him from action only to such time as the Act of November 11, 1921, became effective as a law, and no longer. When this act becomes effective, Hackmann's hands should not be tied, and the court erred in making his order perpetual as to all time.

The judgment is reversed, and the cause remanded to the circuit court with directions to modify such judgment as herein indicated, and enter such modified judgment as the judgment of this case. *James T. Blair, C. J.,* and *Graves, Elder* and *Walker, JJ.,* concur; *David E. Blair, J.,* concurs in a separate opinion; *Higbee, J.,* dissents in opinion filed.

DAVID E. BLAIR, J. (concurring).—I concur *in toto* in all of the majority opinion except paragraph six, and concur in the result reached in that paragraph, and therefore concur in the final disposition of the case.

The reference in the majority opinion to the ineffectiveness of the use of the public peace, health and safety clause, if it had been used, is gratuitous and unnecessary because the General Assembly did not use that clause or attempt by its use to exempt the act in question from the operation of the referendum.

I dissented in a separate opinion in State ex rel. Pollock v. Becker, 289 Mo. 660, 233 S. W. 641, and still adhere to my views in relation to the use of the public peace, health and safety clause as expressed therein.

HIGBEE, J. (dissenting).—I concur in paragraphs 1, 2, 3, 4 and 5 of the majority opinion but am unable to concur in paragraph 6 thereof.

The amendment contains this clause: "The Legislature shall enact such laws as may be necessary to carry into effect this amendment." Evidently this contemplates final action on the part of the Legislature. There is no suggestion that the act passed pursuant to this specially delegated power is not in harmony with the amendment or in compliance with its requirements. It was evidently not contemplated that such legislation, so specially enjoined, should be subject to the referendum. It was taken out of the class of general legislation. In my opinion the act became effective upon its passage and approval and the judgment should be reversed.